**Patricia Ann RAY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–03–01011–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 23, 2004.

Discretionary Review Refused
June 29, 2005.

Shawna L. Reagin, Houston, TX, for Appellant.

Dan McCrory, Assistant District Attorney, Charles A. Rosenthal, Jr., District Attorney–Harris County, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, HANKS, and HIGLEY.

## OPINION ON MOTION FOR REHEARING

LAURA CARTER HIGLEY, Justice.

On November 18, 2004, we issued an opinion affirming the trial court's judgment. On December 6, 2004, appellant, Patricia Ann Ray, filed a motion for rehearing. We overrule appellant's motion for rehearing and substitute this opinion for our previous opinion. Our November 18, 2004 judgment, affirming appellant's conviction, remains unchanged.

Appellant was certified to stand trial as an adult for capital murder, found guilty by a jury, and given a mandatory life

sentence.[1] In two issues, appellant contends that the trial court erred in denying her motion to suppress and in admitting into evidence an excerpt from her co-defendant's custodial statement.

We affirm.

## Background

At around four a.m. on August 24, 2002, appellant, who was then 16 years old, and her fifteen-year-old boyfriend, Thomas Vargas, entered the home of eighty-one-year-old Veda Marie Sutton under the pretext of using Sutton's telephone for an emergency. Soon after entering the home, Vargas violently attacked and killed Sutton. As appellant stood by, Vargas repeatedly hit Sutton with a piece of metal. Vargas then stabbed Sutton with a knife and an ice pick. The teenagers then took numerous items belonging to Sutton, set the house on fire, and drove away in Sutton's car. Later in the morning, officers with the Alvin Community College Police Department arrested Vargas and appellant for unauthorized use of a motor vehicle and evading arrest. Because Sutton's murder had occurred in Pearland, Detective H. Hunter of that city's police department arrived at the scene of the teens' arrest. After the officers from the two jurisdictions conferred to determine how the investigation would proceed, appellant and Vargas were transported to the Brazoria County Juvenile Detention Center. After arriving at the detention center at approximately 10:00 a.m., Detective Hunt tried, without success, to obtain from appellant a telephone number for her mother. Appellant did not provide the authorities with a number until 12:00 p.m. Efforts were then made to notify appellant's mother of her daughter's arrest and whereabouts. Although continuing attempts were made to call the mother, the authorities did not reach her until 4:30 p.m.

Between 1:42 p.m. and 2:33 p.m., appellant received the statutorily required warnings from a magistrate and gave a tape-recorded statement to police. Based on the Texas exclusionary rule,[2] appellant filed a motion to suppress the taped statement. Appellant asserted, *inter alia*, that the statement was taken in contravention of the parental-notification requirements of Family Code section 52.02(b). In particular, appellant asserted that the officers "took little action to find one of [appellant's] parents" before taking the statement. *See* TEX. FAM.CODE ANN. § 52.02(b) (Vernon Supp.2004–2005). Following an evidentiary hearing, the trial court denied appellant's motion to suppress. In support of its ruling, the court orally stated on the record that the requirements of the parental notification statute had been met.

## MOTION TO SUPPRESS

In her first point of error, appellant contends that the trial court erred by denying her motion to suppress the taped statement.

### STANDARD AND SCOPE OF REVIEW

We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Balentine v. State,* 71 S.W.3d 763, 768 (Tex.Crim.App.2002).

Applying this standard, we afford deference to the trial court's determination of the historical facts but decide de novo whether the trial court erred by misapplying the law to the facts. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim. App.1997). If no fact findings are filed, we presume that the trial court made implicit findings of fact that support its ruling,

---

1. *See* TEX. PEN.CODE ANN. §§ 8.07(c), 12.31(a) (Vernon 2003).

2. *See* TEX.CODE CRIM. PROC. ANN. art. 38.23(a) (Vernon Supp.2004–2005).

provided these facts are supported by the record. *See Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Crim.App.2000). We review de novo application-of-law-to-fact questions that do not turn on an evaluation of credibility and demeanor. *See Guzman*, 955 S.W.2d at 89.

In this case, whether the requirements of Family Code section 52.02(b) were satisfied is an application-of-law-to-fact question. *See Vann v. State*, 93 S.W.3d 182, 184 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (applying de novo review to question of compliance with 52.02(b)). In making this determination, we will view the evidence at the suppression hearing in the light most favorable to the trial court's ruling and review de novo the trial court's resolution of the question. *See id.*

### REQUIREMENT OF PROMPT NOTIFICATION

■ Family Code section 52.02(b) requires that a person taking a child into custody promptly give notice of the person's action, and a statement of the reason for taking the child into custody, to the child's parent, guardian, or custodian. TEX. FAM.CODE ANN. § 52.02(b). When a juvenile defendant seeks to suppress a statement allegedly obtained in violation of section Family Code 52.02(b), the burden of proof is initially on the defendant to show a violation of that section. *See Roquemore v. State*, 60 S.W.3d 862, 869 (Tex. Crim.App.2001). If the defendant demonstrates such violation, then the burden shifts to the State to prove compliance with section 52.02(b). *See id.*

On appeal, appellant first contends that her mother was not "promptly" notified when she was taken into custody, and, for that reason, her confession should have been suppressed. The Court of Criminal Appeals has repeatedly recognized the necessity of strict compliance with the Family Code provisions governing the handling of juvenile defendants. *See id.* at 870 (cit-

ing *Baptist Vie Le v. State*, 993 S.W.2d 650, 655 (Tex.Crim.App.1999) and *Comer v. State*, 776 S.W.2d 191, 196 (Tex.Crim. App.1989)). Undoubtedly, this strict-compliance requirement applies to section 52.02(b). *See In re J.B.J.*, 86 S.W.3d 810, 815 (Tex.App.-Beaumont 2002, no pet.). However, strict compliance with this provision has never been interpreted by a court to mean that a statement cannot be taken from a juvenile until notification has been given to the parent or guardian; rather, courts have striven to determine whether the notification was given "promptly," as the statute requires. *See, e.g., id.* Because the term "promptly" is not statutorily defined for purposes of section 52.02(b), courts have taken different approaches in determining whether parental notification was promptly given under the particular facts presented.

■ As recognized by the Fourteenth Court of Appeals, Texas appellate courts have considered the following factors in determining whether parental notification was "prompt": (1) the length of time the juvenile had been in custody before the police notified a parent, guardian, or custodian; (2) whether notification occurred after the police obtained a statement; (3) the ease with which the police were ultimately able to contact the appropriate adult; and (4) what the police did during the period of delay. *Vann*, 93 S.W.3d at 185 (citing *Gonzales v. State*, 67 S.W.3d 910, 911 (Tex. Crim.App.2002); *Hampton v. State*, 36 S.W.3d 921, 924 (Tex.App.-El Paso 2001), *rev'd, Hampton v. State*, 86 S.W.3d 603 (Tex.Crim.App.2002); *Hill v. State*, 78 S.W.3d 374, 382–84 (Tex.App.-Tyler 2001, pet. ref'd); *In re C.R.*, 995 S.W.2d 778, 783 (Tex.App.-Austin 1999, pet. denied)); *cf. J.B.J.*, 86 S.W.3d at 815 (applying "totality of the circumstances" approach to determine whether parental notification was promptly given). We find the factors list-

ed in *Vann* to be both pragmatic and definitive. And, as an amalgam of the considerations that other courts have used, this approach has a solid basis in Texas jurisprudence. Thus, we apply the four factors listed in *Vann* to the evidence presented in this case to determine whether the notification was promptly given.

### (1) Length of Time Appellant was in Custody Before Notification

At the suppression hearing, Detective Hunt confirmed that appellant was arrested by the Alvin Community College Police "a little before 8 a.m." Appellant's mother was notified that her daughter was in custody at 4:30 p.m. Thus, approximately eight and one-half hours passed between the time appellant was taken into custody and her mother was notified.

### (2) Whether Notification Occurred after the Police Obtained a Statement

Parental notification in this case occurred after the statement was taken.

### (3) Ease with which Notification Was Ultimately Made

Detective Hunt testified that he and appellant arrived at the juvenile detention center at approximately 10:00 a.m. At that time, he asked appellant for her mother's telephone number. The detective stated that he wanted to contact appellant's mother to inform her of appellant's "situation" and whereabouts. Detective Hunt was unable to obtain the number from appellant. He described her demeanor as "distraught" and stated that she was crying. Detective Hunt confirmed that he would have contacted appellant's mother at that time if appellant had given him a telephone number.

Melissa Callaway, an employee of the Brazoria County Juvenile Probation Department, testified at the suppression hearing that she heard Detective Hunt ask appellant for her mother's telephone number, but appellant did not provide him with the number. She described appellant's demeanor as "very, very emotional."

Callaway informed Detective Hunt that she had previously dealt with appellant at the detention center. Callaway told Detective Hunt that she had a rapport with appellant and believed that she could obtain the mother's number. Detective Hunt turned custody of appellant over to Callaway at 11:30 a.m., after Callaway told him that she would attempt to obtain the contact number from appellant.

In her brief, appellant points to evidence indicating that Detective Hunt knew she had previously been processed at the juvenile detention center and that a file existed that possibly contained a contact number for appellant's mother. Appellant suggests that Detective Hunt should have made efforts to obtain these other files at the time of appellant's arrest in this case. When cross-examined on this point, Detective Hunt explained the reason that he did not attempt to obtain these files was because they were not his files and the files would have contained "old information."

Callaway testified that she had previously dealt with appellant in the juvenile system and believed that she could obtain the mother's number from appellant. After speaking with appellant for 20 or 30 minutes, Callaway obtained the mother's work and mobile telephone numbers from appellant. Callaway then telephoned appellant's mother but was unable to reach her. When asked whether she had continued to call appellant's mother until her shift ended, Callaway responded affirmatively. Callaway testified that her shift ended at 2:00 p.m. At that time, she gave the telephone numbers to a "Ms. Tyus" at the detention center, who ultimately reached appellant's mother at 4:30 p.m.

### (4) What Law Enforcement Officials Did During Period of Delay

The following is a time-line constructed from the evidence presented at the suppression hearing:

Shortly before 8:00 a.m. Appellant and Vargas taken into custody by Alvin Community College Police for unauthorized use of a motor vehicle and evading arrest

8:00 a.m. to 9:30 a.m. Appellant and Vargas remain at arrest scene; City of Pearland investigators arrive at arrest scene; Pearland and Alvin Community College police confer to determine how investigation should proceed

9:30 to 10:00 a.m. Appellant and Vargas transported to juvenile detention center

10:00 a.m. Appellant arrives at juvenile detention center

10:00 a.m. to 11:30 a.m. Detective Hunt tries to obtain mother's telephone number from appellant; Detective Hunt books appellant and Vargas; authorities waiting for magistrate to arrive to give required warnings

11:30 a.m. Detective Hunt turns custody of appellant over to Callaway

11:30 a.m. to 12:00 p.m. Callaway speaks with appellant to obtain mother's telephone number

Around 12:00 p.m. Callaway obtains mother's work and mobile telephone numbers from appellant

12:00 p.m. to 2:00 p.m. Callaway telephones appellant's mother but is unable to reach her; Callaway completes the booking process; Callaway's shift ends at 2:00 p.m. and she gives mother's telephone numbers to Tyus

1:42 p.m. to 2:33 p.m. Appellant receives warnings from magistrate and provides tape-recorded statement

4:30 p.m. Appellant's mother contacted by Tyus

### ANALYSIS UNDER VANN FACTORS

■ The evidence presented relevant to the third and fourth factors weigh strongly in favor of the State's position that the notification was "prompt." Although the second, and arguably the first, factors weigh in favor of a conclusion that the notification was not prompt, they are not alone compelling enough either to refute that the notification was prompt or to neutralize the effect of the evidence presented in relation to the third and fourth factors. Moreover, when viewed in the context of the evidence relating to the third and fourth factors—rather than in isolation—the delay in notification highlighted by the first and second factors is explained; thus, the impact of the first and second factors is mitigated.

Of particular importance in this case is the evidence presented that demonstrates that the officers made diligent efforts to notify appellant's mother. The evidence shows that for the first one-and-one half hours that appellant was in custody, she remained at the scene of her arrest because it was uncertain where appellant would be transported due to the conflicting jurisdiction of the law enforcement agencies involved. The evidence further shows that, once at the juvenile detention center, Detective Hunt made efforts to procure the mother's telephone number from appellant, but through no fault of Detective Hunt, he could not obtain the number from her. The detective made clear in his testimony that he would have contacted the mother at that time if appellant had provided him with her number. Callaway confirmed that the detective tried to obtain the number from appellant. Detective Hunt offered a reasonable explanation why he did not attempt to obtain a telephone

number that may have appeared in records from previous contacts that appellant had with the detention center.

The evidence further showed that, even though she had a rapport with appellant, it still took Callaway 20 to 30 minutes to obtain the mother's telephone numbers from appellant. Callaway then attempted to reach the mother for the next two hours without success. Callaway gave the numbers to the person on the next shift, who ultimately reached appellant's mother at 4:30 p.m.

Considering the factors enunciated in *Vann*, we conclude that the parental notification in this case was promptly given as required by section 52.02(b). We hold that the trial court properly denied appellant's motion to suppress.

We overrule appellant's first issue.

## ADMISSION OF CO–DEFENDANT'S CUSTODIAL STATEMENT

In her second point of error, appellant complains that the trial court erred by allowing the State to read into evidence an excerpt from Vargas's custodial, tape-recorded statement. In that excerpt, Vargas stated that he found a piece of wrought iron fence lying by Sutton's front door. He confessed that he picked up the piece of iron, brought it in Sutton's home, and hit her with it. Vargas stated that after he hit her, Sutton was "laying [sic] down" and begged him not to hit her again.

On appeal, appellant contends that the admission of the statement violated her right to confrontation under the Sixth Amendment Confrontation Clause of the United States Constitution and under article I, section 10 of the Texas Constitution.

STATE CONSTITUTIONAL RIGHT TO CONFRONTATION

■ We begin our analysis by holding that appellant failed to preserve her article I, section 10 complaint. The basis for appellant's objection at trial was a federal case construing the Sixth Amendment right to confrontation, not the article I, section 10 right found in the State constitution. Appellant never objected that the admission of her co-defendant's statement violated her state constitutional right to confrontation. Accordingly, this sub-point was not preserved for our review. *See* TEX.R.APP. P. 33.1(a); *see also Heidelberg v. State*, 144 S.W.3d 535, 542–43 (Tex. Crim.App.2004) (holding defendant failed to preserve for appellate review claim that State's use of defendant's post-arrest, pre-warning silence violated state constitution when defense failed to cite the state constitution, and record did not otherwise indicate that objection related to state constitutional rights).

SIXTH AMENDMENT RIGHT TO CONFRONTATION

■ Since appellant was tried, the United States Supreme Court held that, without exception, testimonial statements of witnesses absent from trial are admissible over a Confrontation Clause objection only when (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). In this case, the State does not contest that Vargas's statement, taken during custodial interrogation, was inadmissible under the newly crafted test enunciated in *Crawford*. Instead, the State contends that the admission of the statement was harmless error.

■ Because the Sixth Amendment right of confrontation is a fundamental right, and because a violation of that right constitutes constitutional error, we must reverse a trial court's judgment when Confrontation Clause error is present unless we can determine beyond a reasonable doubt that the error did not contribute to

the conviction. *See* Tex.R.App. P. 44.2(a) (requiring reversal of constitutional error unless appellate court determines beyond reasonable doubt that error did not contribute to conviction); *see also Evans v. State,* 534 S.W.2d 707, 711 (Tex.Crim.App. 1976) (concluding that error of admitting co-defendant's statement was not harmless beyond a reasonable doubt).

 In making this determination, we do not focus on the propriety of the outcome of the trial. *McCarthy v. State,* 65 S.W.3d 47, 55 (Tex.Crim.App.2001). Instead, our task is to "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Id.* If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim.App.2000).

 In this case, the State sought to convict appellant under two theories of capital murder: (1) as a party, with Vargas acting as principal[3] and (2) as a conspirator under the law of parties.[4] The jury was instructed regarding the State's law of the parties' theories. In addition, the jury was charged with determining whether the State had proven beyond a reasonable doubt that Vargas caused Sutton's death by using a combination of the following manner and means: striking Sutton with a piece of metal, stabbing her with a knife, and/or stabbing her with an ice pick. The

trial court admitted the excerpt from Vargas's statement for the purpose of showing that he hit Sutton with a piece of metal— one of the instrumentalities of the crime.

The excerpt from Vargas's statement that was read to the jury imparted three pieces of information: (1) that Vargas brought a piece of iron into Sutton's home and hit her with it; (2) that Sutton was lying on the floor after Vargas hit her; and (3) that Sutton begged Vargas not to hit her again.[5] Undoubtedly, Vargas's statement constituted direct proof that he hit her with a "piece of metal." However, as pointed out by the State, the statement was cumulative of appellant's own trial testimony. Appellant testified that, when she saw Vargas enter Sutton's home, he was carrying what appellant described as a "metal pole" or "iron rod." Appellant testified that she witnessed Vargas repeatedly hit Sutton with the "metal pole." Courts have held that the wrongful admission of cumulative evidence is considered harmless. *See Sterling v. State,* 800 S.W.2d 513, 520 (Tex.Crim.App.1990) (holding that admission of illegally obtained confession was harmless in light of second admissible confession containing substantially same facts); *see also Franks v. State,* 90 S.W.3d 771, 805–06 (Tex.App.-Fort Worth 2002, no pet.) (holding that because complained-of testimony was generally cumulative of other evidence introduced in case, no harm attached); *Mack v. State,* 928 S.W.2d 219, 225 (Tex.App.-Austin 1996, pet. ref'd) (holding error is not reversible "if other

---

**3.** Tex. Pen.Code Ann. § 7.02(a)(2) (Vernon 2003).

**4.** *Id.* § 7.02(b).

**5.** Appellant also contends that "Vargas' confession also served to impeach Appellant's statement that Vargas had gotten a stick over by the tennis courts, which he apparently used to strike the complainant." Such contention is without merit. Vargas's statement

did not address whether the couple had, or had not, gotten a "stick" from the tennis court near Sutton's home. More importantly, to the extent that appellant's statement could be construed to imply that the "stick" obtained from the tennis court was the instrument Vargas used to beat Sutton, such implication was refuted by appellant's own trial testimony that Vargas hit Sutton with a "metal pole" or "iron rod."

evidence at trial is admitted without objection and it proves the same fact or facts that the inadmissible evidence sought to prove").

Moreover, at trial, appellant did not contest that Vargas killed Sutton. Rather, appellant's theory of the case was that she assisted Vargas during the commission of the offenses because she was under duress.[6] In fact, appellant gave detailed testimony about the brutality of Sutton's murder at the hands of Vargas. She testified that she witnessed Vargas push his way into Sutton's home and, without provocation, repeatedly beat Sutton with the metal pole, then stabbed her with a knife. Appellant stated that when she left Sutton's house, she saw an ice pick sticking out of Sutton's back. She then described how Vargas poured accelerants inside the house and set it on fire. Although the State was required to prove beyond a reasonable doubt the manner and means by which Vargas killed Sutton, the most powerful evidence that the State had in this regard was the live testimony of appellant, who witnessed the murder first-hand and gave a vivid description of Vargas's actions.

Appellant also contends in her brief that "[t]he harm in admitting Vargas's confession was exacerbated by the inclusion of the portion that described how the complainant was lying down when he hit her and was begging him not to hit her anymore." The impact of this portion of the statement was also over-shadowed by appellant's trial testimony. Appellant conveyed to the jury that after Vargas initially hit Sutton, she fell to the floor. Appellant told the jury that Vargas made Sutton get up and walk to the kitchen. Appellant testified that this was difficult for eighty-one-year-old Sutton. Once in the kitchen, Vargas continued to beat Sutton with the piece of metal. After the teenagers began searching the house for items to steal, appellant screamed, alerting Vargas that Sutton was still "moving." Appellant testified that Vargas then stabbed Sutton with a knife.

The autopsy report and the testimony of the assistant medical examiner also mitigated the impact of Vargas statement. The medical evidence showed that Sutton had numerous skull fractures, brain hemorrhaging, multiple stab wounds and abrasions, and a broken arm. The medical evidence also showed that the ice pick Vargas used to stab Sutton had penetrated her heart. The autopsy photographs published to the jury also showed the brutality of Vargas's actions. When asked whether Sutton likely "suffered a great deal before she died," the assistant medical examiner responded affirmatively.

 In light of the other evidence introduced at trial, the impact of admitting the excerpt from Vargas's statement was minimal. We conclude that there is not a reasonable likelihood that the error of admitting the statement materially affected the jury's deliberations. We hold that the error was harmless beyond a reasonable doubt.[7] We overrule appellant's second point of error.

---

6. Appellant claimed that she participated in the offense because she feared that Vargas would also kill her if she did not assist him. The jury received an instruction on the affirmative defense of duress, which it implicitly rejected.

7. Within the discussion of her second point of error, appellant contends in one sentence that the trial court failed to instruct the jury on the law regarding accomplice-witness corroboration with regard to Vargas's statement. Appellant has provided no substantive legal argument or authority on this potential subpoint. Thus, it is waived for our review. *See* TEX.R.APP. P. 38.1(h); *Foster v. State*, 101 S.W.3d 490, 499 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

## CONCLUSION

We affirm the judgment of the trial court.