# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00359-CR

**Manuel Cortez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. D-1-DC-05-900845, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## O P I N I O N

A jury found appellant Manuel Cortez guilty of murder and assessed his punishment at ninety-nine years' imprisonment. *See* Tex. Penal Code Ann. § 19.02 (West 2003). In four points of error, appellant contends that the trial court erred by admitting in evidence statements he made to police officers and his mother that he argues were unlawfully obtained. Finding no reversible error, we affirm the judgment of conviction.

In our review of the trial court's rulings admitting the challenged statements, we defer to the court's findings of fact but review de novo the court's application of the law to those facts. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Horton v. State*, 78 S.W.3d 701, 703 (Tex. App.—Austin 2002, pet. ref'd). We review the evidence in the light most favorable to the trial court's rulings and, where the court did not make express findings of fact, we assume that the court

made findings that are supported by the record and buttress its conclusions. *See Carmouche v. State*, 10 S.W.3d 323, 327-28 (Tex. Crim. App. 2000).

## BACKGROUND

### *Friday, September 23*

On Friday afternoon, September 23, 2005, a group of Austin High School students had just gotten off the school bus when a Honda Accord pulled to the curb beside them. Witnesses to the shooting testified that the front passenger in the car said something to sixteen-year-old Christopher Briseno, who had just gotten off the bus. Then, several shots were fired from the car. Briseno was fatally shot in the head. His sixteen-year-old cousin, Adam Cantu, was shot in the legs.

As the investigation continued over the coming days and weeks, it was learned that six persons had been in the car when the shots were fired. In the front seat were Alan Ruiz, who was the driver, and appellant, who was the front passenger. In the back seat were Alan Ruiz's brother Humberto, his sister Pamela, Juan Soliz, and Victor Saramiento.

### *Saturday, September 24*

Initially, the only occupant of the Accord identified to the police was Humberto Ruiz. The day after the shooting, Austin police officers went to the Ruiz residence, where they met Humberto, Alan, and appellant, who was sixteen years old. The three boys agreed to speak to the officers and were taken to the downtown police station, where they arrived between 1:30 and 2:00 p.m., according to the officer's testimony at the suppression hearing. The officers also testified that

2

they were not then aware of appellant's involvement in the shooting. Appellant was not under arrest or restraint, and he was allowed to wait in the lobby while the Ruiz brothers were being questioned.

Later that afternoon, Pamela Ruiz was also brought to the police station, accompanied by her mother. At trial, a police officer testified that when Pamela walked past appellant, who was still sitting in the lobby, she did a "doubletake."

Shortly after 4:00 p.m., appellant left the police station and walked to a nearby convenience store, where he called a friend for a ride. Meanwhile, statements by the Ruiz siblings gave investigators reason to believe that appellant was the person who had fired the shots that killed Briseno and wounded Cantu.[1] Officers began to look for appellant and found him at the convenience store. Detective Armando Balderama testified that at 4:50 p.m., appellant was returned to the police station, advised that he was under arrest, and placed in an interview room that was designated as a juvenile processing office. *See* Tex. Fam. Code Ann. § 52.025(a) (West 2002).[2]

Balderama testified that he asked appellant if he wanted his parents to be notified. Appellant said that he did. Balderama tried to call appellant's mother, but he got no answer. Balderama successfully called appellant's father and told him that appellant was about to be

---

[1] It is clear that the Ruizes not only incriminated appellant, but they also minimized their own involvement in the shooting. There is evidence that the police allowed the Ruizes to leave the station on Saturday because there was no probable cause to hold them. By the time the police learned that they had played a culpable role in the shooting, the Ruiz family had fled to Mexico. Some months later, the three siblings returned to Austin and were arrested. They were awaiting trial for Briseno's murder at the time of appellant's trial.

[2] Appellant testified that he was taken to the police station at 12:30 p.m. and told that he was being detained because he "did not have a license." Appellant said that he asked to call his parents, but the officers would not allow it. Appellant also testified that he was not allowed to call his parents after he was returned to the police station and placed in the juvenile processing office.

3

transferred to the Gardner-Betts juvenile detention facility. Appellant was then taken to another location to await transfer. While they were waiting, appellant asked Balderama "how long I thought he was going to have to . . . remain in jail." Balderama told appellant that "he was getting ahead of himself, that he needed to wait and see." Appellant's question to Balderama is the first of the three statements that appellant urges should have been suppressed.

Detective Frank Rodriguez testified that minutes after appellant was returned to the police station and placed in the interview room, he encountered appellant's mother and brother in the downstairs lobby. They asked the officer for appellant's whereabouts, and he told them that appellant had been detained for a crime that had been committed the day before. Appellant's mother responded that the police should also arrest Alan Ruiz because appellant had been with him all day on Friday. Rodriguez testified that he needed to go back upstairs where the interviews were taking place, so he excused himself but told appellant's mother that he would be "right back." Rodriguez said that when he later returned to the lobby, appellant's mother and brother were gone.

Appellant's mother testified that she went to the police station at 2:00 p.m. after receiving a telephone call from Alan Ruiz saying that appellant had been arrested. She said that Rodriguez told her that appellant was being questioned and that she could not see him. She testified that after she returned to her home, a police officer called her and told her that appellant was being charged with murder, that she could not see him, and that he was going to be taken to Gardner-Betts.[3]

---

[3] Appellant's mother testified that this call came from Rodriguez. The officer testified, however, that he had no further conversations on Saturday with members of appellant's family after appellant's mother left the police station.

4

She said that she made no effort to see appellant that day because she did not have permission to do so.

Richard Bratton was the intake officer at Gardner-Betts on the evening of September 24, 2005. Bratton testified that upon appellant's arrival, he advised appellant of his rights while in detention and called his family. Bratton spoke to a person who he believed was appellant's brother, who was in turn speaking to appellant's mother in Spanish. Bratton told appellant's family some of the details of the offense for which appellant had been arrested, explained appellant's rights, and informed them of the visitation hours at the facility. Appellant's family was not able to visit him at Gardner-Betts that night because the intake process was not completed until after 9:00 p.m., when visitation ended.

### Sunday, September 25

At 11:00 a.m. Sunday morning, Rodriguez and another officer, Hector Reveles, transported appellant from Gardner-Betts to the police station so that he could be advised of his rights by a magistrate. *See id*. § 51.095(a) (West Supp. 2006). Rodriguez and Reveles testified that appellant was not questioned during the drive, but that appellant asked Reveles if the police "wanted the gun" or wanted to know "where the gun was." Reveles said that he told appellant that they would "talk about that later." Appellant's question regarding the gun is the second statement that he sought to have suppressed.

After being advised of his rights by the magistrate, appellant was taken to the juvenile processing office. He refused to give the officers a statement and asked to speak to his parents. There was no telephone in the room, so Rodriguez dialed the number on his cell phone, gave the

5

phone to appellant, and stepped outside. Through a microphone located in the room, Rodriguez heard appellant tell his mother that he had fired two shots but had not hit anyone, and that Alan Ruiz had fired the fatal shots. This is the last of the three challenged statements.

***The trial***

The juvenile court waived its jurisdiction and transferred appellant to district court for trial. *See id*. § 54.02 (West 2002). At the trial, Cantu identified appellant as the front passenger in the Accord and as the person who shot him and Briseno. Jose Ortiz, another student who witnessed the shooting, also identified appellant as the front passenger and shooter. Both Cantu and Ortiz were certain that the driver of the car had not fired the shots. Another bystander, Esteban Zuniga, did not identify appellant, but he did testify (with some equivocation during cross-examination) that the front passenger was the person who fired the shots.

Juan Soliz, one of the back seat passengers in the Accord, identified the other occupants of the vehicle. He said Humberto Ruiz told him that Pamela was having trouble with Briseno and Cantu at school. As the car approached the bus stop, Alan Ruiz took a pistol out of the console between the front seats and handed it to appellant. When the car stopped, appellant called out to Briseno, "Are you Bloods?" Briseno said, "No." Appellant then asked Alan Ruiz if he should "[g]ive it to them." Alan said that he should, and appellant began firing. Soliz testified that Alan did not threaten appellant or otherwise force him to shoot. Soliz said that he was certain that Alan Ruiz did not fire the gun, but he was not sure whether or not Humberto Ruiz had fired the weapon. Soliz also testified that on the day after the shooting, after learning that one of the victims had died, appellant said "it was good so they will not mess with them again."

6

Although they did not testify, there was evidence that two other witnesses to the shooting identified someone other than appellant as the shooter. Rodriguez testified that Victor Saramiento, another passenger in the Accord, gave a statement to the police that was consistent with what appellant told his mother; that is, that Alan Ruiz had fired the fatal shots. Rodriguez also testified that Elvia Hernandez, who lived near the scene of the shooting, told officers that she was sitting on her porch when the shooting occurred and that the "back passenger" had fired the shots.

In his own testimony, appellant acknowledged being the front passenger in the Accord. He said that after he accepted a ride from Alan Ruiz, Ruiz showed him a pistol in the console and told him that "he had to kill two students who were in school because they were messing with his sister." After picking up the other passengers at the school, Ruiz followed the bus. As they drove, Ruiz handed the pistol to appellant and told him, "You're going to kill him." When appellant protested, Ruiz said, "Okay. Well, just tell him—ask him some questions, things I want to know." When Briseno got off the bus, Pamela Ruiz pointed and said, "Look, it's him." At Alan Ruiz's insistence, appellant asked Briseno if he was a Blood. Briseno denied it. Pamela Ruiz said, "He's telling lies. He's the one that was messing with me." Then she said, "Kill him. Kill him." With that, Alan Ruiz reached across appellant and began firing. According to appellant, Ruiz then handed the pistol to him and ordered him to shoot. Appellant testified that he was afraid of Ruiz, and that he fired two shots into the air.

The court's jury charge included an instruction on the law of parties. *See* Tex. Penal Code Ann. §§ 7.01, .02 (West 2003). The charge authorized appellant's conviction for murder if the

7

jury found that appellant, acting alone or with others as a party, caused Briseno's death. Appellant does not challenge the sufficiency of the evidence to sustain the jury's verdict.

## STATEMENTS TO OFFICERS

In point of error one, appellant contends that the officers who took him into custody on the afternoon of September 24 failed to promptly notify his parents. *See id*. § 52.02(b)(1) (West Supp. 2006) (providing that person taking child into custody shall promptly give notice of action and statement of reason to child's parent, guardian, or custodian). In point of error two, appellant further contends that he was not allowed to have his parents with him in the juvenile processing office. *See id*. § 52.025(c) (West 2002) (providing that child detained in juvenile processing office is entitled to be accompanied by parent, guardian, custodian, or attorney). Appellant argues that his question to Balderama about how long he would remain in jail was the inadmissible fruit of these violations. *See* Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005) (exclusionary rule). In point of error three, appellant contends that his remark to Reveles regarding the gun should also have been suppressed as the product of these juvenile code violations.

### *Section 52.02(b)(1)*

The failure to comply with the section 52.02(b)(1) notice requirement will render inadmissible any subsequent statement by the child that is obtained as a result of the statutory violation. *Horton*, 78 S.W.3d at 705 (citing *Gonzales v. State*, 67 S.W.3d 910, 913 (Tex. Crim. App. 2002)). Appellant did not allege a violation of that section in his motion to suppress, he did not mention the statute at the suppression hearing, and he did not cite the statute in his post-hearing

8

memorandum of law to the trial court. *See Hill v. State*, 78 S.W.3d 374, 382 (Tex. App.—Tyler 2001, pet. ref'd); Tex. R. App. P. 33.1(a).

Assuming the issue is properly before us, no violation of section 52.02(b)(1) is shown. The juvenile code does not define what is meant by "prompt" notification. Whether the statute has been complied with must be determined under the circumstances of the particular case. *Ray v. State*, 176 S.W.3d 544, 548 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *Vann v. State*, 93 S.W.3d 182, 185 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Among the factors to consider are the length of time the juvenile was in custody before notice was given, whether notice was given before or after the police obtained a statement from the juvenile, the ease with which the police were ultimately able to contact the appropriate adult, and what the police did during the period of delay. *Vann*, 93 S.W.3d at 185. We defer to the trial court's findings of historical fact, but we review de novo the court's application of the law to those facts. *In re C.R.*, 995 S.W.2d 778, 782 (Tex. App.—Austin 1999, pet. denied).

In *C.R.*, the juvenile was taken into custody by the police at 11:00 p.m. *Id*. at 782. After his mother twice called the police station to learn what was happening to her son, she was called by an officer at 1:00 a.m. and told that her son was not in custody, that he was "helping" the officers "on a job," and that it was not necessary for her to come to the station. *Id*. In fact, the juvenile was being questioned about his involvement in a murder. *Id*. at 780. At 5:00 a.m., the juvenile's mother was notified that he had been taken to the juvenile detention facility. *Id*. at 782. The mother's testimony was not refuted by the State's witnesses; in fact, the officer who questioned the juvenile conceded that he had made no effort to contact her. *Id*. This Court

9

concluded that the State had failed to show that the juvenile's statement was taken in compliance with section 52.02(b). *Id*. at 783.

The facts before us in this cause are considerably different. Although the testimony regarding the relevant time frame was not detailed to the minute, it is clear that only a short time passed between appellant being taken into custody and the notification of his parents. Balderama testified that he called appellant's father and notified him that appellant was in custody minutes after appellant was placed in the juvenile processing office.[4] Rodriguez testified that he encountered appellant's mother in the police station lobby minutes after appellant was arrested and told her that appellant had been detained for a crime committed the previous day. Finally, appellant's mother testified that a police officer called her after she returned home and told her that appellant had been arrested for murder. The evidence reflects that appellant was not questioned by the police before notice of his arrest was given to his parents, and the challenged statements were made after notice was given. Appellant argues that Balderama's telephone call to his father and Rodriguez's statement to his mother in the lobby did not comply with section 52.02(a)(1) because neither officer said that appellant was being investigated for murder. *See id*. According to appellant's mother, however, an officer called her soon after she returned home and told her that appellant had been arrested for murder. And unlike *C.R.*, there is no evidence that the police misled appellant's parents about his status or attempted to question him before his parents were properly notified.

---

[4] Because we view the evidence in the light most favorable to the trial court's ruling, we infer that the court did not believe appellant's testimony at the suppression hearing that he was taken into custody at 12:30.

We conclude that appellant's parents were promptly notified as required by section 52.02(b)(1). *See Ray*, 176 S.W.3d at 550-51 (holding that notice to parents over eight hours after arrest was prompt where officers had diligently sought to contact parents without success); *Vann*, 93 S.W.3d at 185 (holding that notice to custodian two-and-a-half hours after arrest was prompt); *In re J.B.J.*, 86 S.W.3d 810, 815-16 (Tex. App.—Beaumont 2002, no pet.) (holding that notice to parents one-and-a-half hours after arrest and after repeated attempts was prompt); *Hill*, 78 S.W.3d at 383-84 (holding that notice to parents over four hours after arrest was not prompt where officers made no effort to contact parents earlier, before juvenile made statement).

### Section 52.025(c)

A child being held in a juvenile processing office may not be left unattended and is entitled to be accompanied by his parent. Tex. Fam. Code Ann. § 52.025(c). The statute does not require that a parent be present, however. *See Leonard v. State*, No. 01-93-01066-CR, 1997 Tex. App. LEXIS 51, at *3 (Tex. App.—Houston [1st Dist.] Jan. 9, 1997, no pet.) (not designated for publication). The record before us supports a finding that appellant did not ask for his parents and that appellant's parents did not ask to be present.

Rodriguez testified that appellant was monitored for the entire time that he was held in the juvenile processing office and that he never asked to have his parents with him. Balderama testified to the same effect. Even appellant, who testified that he asked to speak to his parents, did not testify that he wanted one or both of them to be present with him in the processing office.[5] The

---

[5] Appellant testified that he was not told that he had a right to have his parents with him. He was not asked and did not say whether he would have invoked that right. Appellant does not

evidence supports the trial court's implied finding that appellant did not request the presence of his parents in the processing office.

There is no evidence that appellant's father asked to speak to or be with his son while he was detained in the processing office. Appellant's mother testified that she asked to see appellant while she was at the police station on the afternoon he was arrested, but this request was denied. Her testimony was contradicted by Rodriguez, who testified that appellant's mother did not ask to see her son before leaving the police station. The trial court, as trier of fact at the suppression hearing, could reasonably conclude from the officers' testimony that neither of appellant's parents asked to be with appellant while he was detained in the processing office.

### *Causal connection*

Even if appellant's parents were not promptly notified of his arrest or appellant was denied the right to have his parents with him in the juvenile processing office on Saturday afternoon, no causal connection has been shown between these alleged violations and appellant's statements to the two officers. *See Gonzales*, 67 S.W.3d at 913 (holding that suppression required only when there is causal connection between violation of parental notice requirement and receipt of juvenile's statement). Neither statement was made while appellant was in the juvenile processing office, and thus his parents would not have been present. This distinguishes the instant case from *State v. Simpson*, 105 S.W.3d 238 (Tex. App.—Tyler 2003, no pet.), on which appellant relies. In *Simpson*, a juvenile was interrogated and gave a written confession to participating in a capital

---

contend that the police were obligated to advise him of his right to have his parents present, and we express no opinion regarding that issue.

murder before his parents were notified, more than forty-eight hours following his arrest. *Id*. at 240. The court found a causal connection between the lack of notice and the statement, saying that there was "nothing in the record to indicate that either of [Simpson's] parents would have advised [him] to make or sign a statement implicating himself in the commission of capital murder" had they been present during the interrogation. *Id*. at 243.

Appellant hypothesizes that if his parents had come to the juvenile processing office, they would have advised him against making any statements or having any conversations with the police. Accepting this hypothesis as true, we are not persuaded that this advice would have deterred appellant from making the two statements at issue. The trial court found that the statements were not the products of interrogation, and the evidence supports this finding. In fact, the evidence reflects that on both occasions, appellant and the officers were not even engaged in conversation when he spontaneously made the challenged remarks. We find no causal connection between the two statements and the officers' alleged failure to promptly notify appellant's parents of his arrest and the alleged denial of appellant's right to have his parents with him in the juvenile processing office.

***Harmless error***

Even if appellant's rights under the juvenile code were violated and even if there were a causal connection between these violations and appellant's statements to the officers, we conclude that the admission of the statements did not affect appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). Appellant's question to Balderama inquiring how long he would have to remain in jail showed that appellant was curious about the seriousness of his situation. This curiosity is understandable and not particularly incriminating. The statement to Reveles regarding the gun was

13

a more serious matter because it implicitly showed that appellant had some knowledge about the shooting and the weapon. Still, the statement does not necessarily compel the conclusion that appellant was guilty of the murder. Appellant could have been offering to disclose information he had learned from someone else, such as Alan Ruiz.

In any event, appellant's involvement in the shooting was not a contested issue at his trial; only the nature of that involvement was in question. In his own trial testimony, appellant admitted being in the car and firing two shots, albeit into the air. Even if the challenged statements had not been admitted, appellant would have had little choice but to admit his involvement in light of the eyewitness testimony identifying him as the front passenger and his mother's statement to the police that appellant had spent the day of the shooting with Alan Ruiz. In light of appellant's testimony, any error in the admission of appellant's question to Balderama regarding how much time he might spend in jail and his question to Reveles as to whether the police wanted the gun may be disregarded as harmless. These remarks to the officers merely confirmed what appellant did not contest: that he was present in the car from which the shots were fired.

**STATEMENTS TO MOTHER**

In his fourth point of error, appellant contends that Rodriguez unlawfully eavesdropped on his telephone conversation with his mother on Sunday afternoon, September 25, after he had been taken before the magistrate. He argues that the use of a hidden microphone to listen to his conversation violated his reasonable expectation of privacy under the Fourth Amendment. He further argues that the officer's conduct constituted an unlawful, unauthorized

14

interception of an oral communication. *See* Tex. Code Crim. Proc. Ann. art. 18.20 (West Supp. 2006).

### *Fourth Amendment*

The Fourth Amendment serves to safeguard an individual's privacy from unreasonable governmental intrusions. *Richardson v. State*, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993). A defendant may challenge the admission of evidence obtained by governmental intrusion only if he had a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). To determine whether a person had a reasonable expectation of privacy, it must be determined whether the person exhibited a subjective expectation of privacy and, if so, whether that subjective expectation is one that society is willing to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979). In this case, appellant exhibited a subjective expectation of privacy while speaking to his mother; the question presented is whether this expectation was reasonable.

Whether a subjective expectation of privacy is one that society recognizes as reasonable is a question of law. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996). Among the factors to consider in answering this question are whether the accused: had a property or possessory interest in the place invaded; was legitimately in the place invaded; had complete dominion or control and the right to exclude others; took normal precautions customarily taken by those seeking privacy; put the place to some private use; and has a claim of privacy consistent with historical notions. *Calloway v. State*, 743 S.W.2d 645, 651 (Tex. Crim. App. 1988). A consideration of these factors leads us to conclude that appellant did not have a reasonable

expectation of privacy in the police interview room that doubled as the juvenile processing office.[6] Appellant had no property or possessory interest in the office, no dominion or control of the office, and no right to exclude others from the office. Appellant was legitimately in the office only in the sense that he had been lawfully taken into custody by the police. Although appellant put the office to a private use, there is no evidence that he asked Rodriguez to leave the room or took any precautions to ensure his privacy. Finally, appellant's claim of privacy in a police station interview room is not consistent with historical notions of privacy.

A similar case was recently considered by the court of criminal appeals. In *State v. Scheineman*, Scheineman and his co-defendant were arrested and placed in separate interview rooms. 77 S.W.3d 810, 811 (Tex. Crim. App. 2002). The co-defendant asked a deputy if he could speak alone with Scheineman. *Id*. The deputy agreed, moved Scheineman into the room occupied by the co-defendant, and left the two of them alone. *Id*. The two men then discussed their criminal conduct while, unbeknownst to them, officers monitored and recorded their conversation. *Id*. Scheineman argued that the deputy's conduct had "lulled" him and his co-defendant into believing that their conversation was private and thereby gave them a legitimate expectation of privacy. *Id*. The court of criminal appeals disagreed. The court observed that a loss of privacy is an inherent incident of confinement, whether in a jail cell or a police station interview room. *Id*. at 813. After noting that there was no evidence that the deputy had given the two defendants any verbal assurance of privacy, the court held that society is not prepared to recognize a legitimate expectation of privacy

---

[6] There was no telephone in the interview room. Therefore, we assume that there was no sign warning that telephone calls from the room were monitored.

in a conversation between two arrestees in a county law enforcement building, even if the arrestees are the only persons present and subjectively believe that they are unobserved. *Id.*

The evidence before us shows that Rodriguez dialed appellant's mother's telephone number, handed appellant the cell phone, and left the room. Appellant argues this conduct "tricked" him into believing that his telephone conversation with his mother was private. But as in *Scheineman*, there is no evidence that the officer gave appellant any express assurance that what he said to his mother would not be heard by others. The evidence supports the trial court's finding that Rodriguez did not engage in any dishonesty or deliberately mislead appellant into believing that the conversation was private. Although appellant's juvenile status may have entitled him to rights and considerations not afforded adults under the same circumstances, we do not believe that society is prepared to accept as reasonable appellant's subjective belief that he could sit in a police interview room and discuss on the telephone his role in a murder for which he had been arrested without being overheard by the police, at least in the absence of any evidence of police conduct intended to give appellant the impression that his conversation would be private.

*Article 18.20*

Appellant's contention that article 18.20 was violated was not raised below. No violation of the statute is shown in any case. An "oral communication" subject to the statute is one that is "uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation." Tex. Code Crim. Proc. Ann. art. 18.20, § 1(2). We have held that article 18.20 protects persons engaged in oral communications under circumstances justifying an expectation of privacy. *Meyer v. State*, 78 S.W.3d 505, 509

(Tex. App.—Austin 2002, pet. ref'd) (also holding that defendant did not have reasonable expectation of privacy in back seat of patrol car). Because appellant did not have a reasonable expectation of privacy under the circumstances shown, he was not justified in the expectation that his statements would not be intercepted. *See id.*

### *Harmless error*

As recounted by Rodriguez in his testimony at trial, appellant's statements to his mother over the telephone were entirely consistent with appellant's own testimony. According to Rodriguez, appellant told his mother that he had fired two shots that did not hit anyone, and that Alan Ruiz had fired the shots that struck the two victims. Appellant testified to the same facts. Defense counsel argued to the jury that the statements appellant made to his mother tended to corroborate his trial testimony by showing that he had consistently told the same story. Under the circumstances, if Rodriguez violated appellant's Fourth Amendment or statutory rights by listening to appellant's conversation with his mother, we are satisfied beyond a reasonable doubt that the admission of appellant's statements during that conversation did not contribute to his conviction or punishment. *See* Tex. R. App. P. 44.2(a).

### CONCLUSION

Viewing the record in the light most favorable to the trial court's rulings, we conclude that appellant's parents were promptly notified after he was taken into custody and that appellant was not denied the right to have his parents with him while he was being held in the juvenile processing office. Moreover, there is no showing of a causal connection between the alleged violations and the

18

spontaneous statements appellant made to the officers. Finally, any error in the admission of these statements was harmless. Points of error one, two, and three are overruled.

Appellant did not have a reasonable expectation of privacy in the juvenile processing office, and the officer did not violate the Fourth Amendment by listening to the statements appellant made to his mother during their telephone conversation. For the same reason, article 18.20 was not violated. And because the statements appellant made to his mother during the conversation were consistent with appellant's trial testimony, any error in the admission of the statements was harmless. Point of error four is overruled.

The judgment of conviction is affirmed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed: August 21, 2007

Publish

19