CYPHER, J.
**42 A jury convicted the defendant, John Odgren, of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty in the stabbing death of a schoolmate. At trial, the defendant conceded that he had killed the victim and asserted that he lacked criminal responsibility because at the time of the stabbing he was in a transient psychotic state brought on by a confluence of mental illnesses and, as a result, lacked the substantial capacity both to appreciate the wrongfulness of his actions and to act in conformity with the law. In his direct appeal, he asserts that the judge erred in instructing the jury, as well as in admitting several conversations recorded while the defendant was in pretrial detention. For the reasons stated below, we affirm. After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict.
*681 Background. We summarize the facts that the jury could have found, reserving certain details for our discussion of the legal issues. On January 19, 2007, the defendant, then sixteen years old and attending Lincoln-Sudbury Regional High School, stabbed to death a schoolmate in a school bathroom using a kitchen knife that he had brought with him that morning. On the morning of the **43 killing, the defendant entered a bathroom located in the vicinity of his classroom, stayed for several minutes and then went to another bathroom on a different floor, where he encountered the victim.
The defendant admitted to stabbing the victim, and the details of the encounter were provided primarily through the testimony of another student who was using one of the bathroom stalls at the time of the murder. The witness heard a brief struggle between the defendant and the victim, during which he heard the victim exclaim, "What are you doing? Stop that. Ow, ow. You're hurting me." He then heard the victim leave the bathroom and noticed three or four drops of blood at the foot of his stall. The defendant, who was still inside the bathroom, repeated, "Oh, my God. Oh, my God. What did I just do?" several times and, after a pause, say, "Whoever is in that stall, I need you to go get help."
When the witness opened the stall door, the defendant was sitting on the floor with his arms wrapped around his knees, "kind of clutched up in a fetal-type position," and a large, knife was on the bathroom floor. The defendant again asked the witness to find help and stated that he would not hurt him. When the witness left the bathroom, the victim was lying in the hallway just outside the bathroom door.
When the witness returned to the area with help, he saw the defendant kneeling next to the victim. The defendant stated, "Don't let him die. It was all me. I did this. I just went crazy." He also asked if the victim was "okay" several times and continued, "I think I did it. I don't know why. I blank sometimes, but I'm not psychotic."[1] At that time, the victim was breathing slowly and had a weak pulse, but when a school nurse arrived moments later, the victim did not have a pulse. Shortly thereafter, he was pronounced dead at a local hospital. An autopsy established that the victim had lacerations on his neck and chin and defensive wounds on his fingers and that he died from stab wounds to his heart, left lung, and liver.
At trial, the defendant did not contest that he had killed the victim; rather, he argued that he lacked criminal responsibility because, due to a mental disease or defect, he lacked the substantial capacity at the time of the killing both to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements **44 of the law.
A history of the defendant's mental health issues was provided by the testimony of his father. As a young child, the defendant engaged in atypical social behavior, was the object of bullying, was unable to socialize with other children, became increasingly fascinated with weapons and the macabre, and often expressed suicidal and homicidal ideations.
The defendant began receiving treatment for major depressive disorder beginning in the third grade. He was subsequently diagnosed with Asperger's syndrome, an autism-spectrum disorder, as well as attention deficit hyperactivity disorder, general anxiety with symptoms similar to that of obsessive compulsive *682 disorder, oppositional defiant disorder, affective dysregulation, cerebral dysfunction, and mood dysregulation not otherwise specified. The defendant attended several schools with programs aimed at addressing his special needs before entering a program at the public high school in Lincoln-Sudbury in 2006.
To support his defense of lack of criminal responsibility, defense counsel called three mental health experts -- Dr. Richard Barnum, a child and adolescence psychiatrist; Dr. Ross Greene, a clinical child psychologist; and Dr. Montgomery Brower, a forensic psychiatrist with a specialty in neuropsychiatry -- who opined in essence that the defendant suffered from one or more related mental illnesses, namely, Asperger's disorder and mood disorder, and that those illnesses, coupled with his increasing feelings of anxiety and paranoia, led to his experiencing a brief psychotic episode during which he was unable to appreciate the wrongfulness of his actions or conform his conduct to the requirements of the law.
Brower testified that at the time of the incident, "symptoms of paranoid psychosis, mood disorder, and also cognitive deficits related to Asperger's disorder substantially impaired [the defendant's] ability to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law." He was of the opinion that the defendant had developed "a very fearful and anxious take on the world because of his difficulties with social interactions and his difficulty reading situations and the repeated conflicts and problems that he had had as a result," and, accordingly, "he was very much increasingly on his guard and afraid of things that might happen to him." Brower concluded that at the time of the murder the defendant was in "a paranoid state" without "the ability to really distinguish between fantasy and **45 reality," and that he "lash[ed] out in a way that reflected a complete loss of control.
Similarly, Barnum opined that at the time of the stabbing the defendant was essentially experiencing an "autistic meltdown," and was so overwhelmed that he could not "undertake any kind of sort of clear action or thought."[2] Greene testified that the defendant was experiencing delusional thinking and that something, although he could not say what, happened in the bathroom to cause the defendant to believe that he was in serious danger, prompting him to react in an "extremely emotional, explosive fashion," and in a way that was "removed from reality" and consistent with transient psychosis.[3]
*683 The Commonwealth called its own expert witness on rebuttal, Dr. Alison Fife, a psychiatrist, who testified that, although the defendant had "Asperger's syndrome, depression, and attention deficit disorder" at the time of the killing, "he did not lack the substantial capacity to appreciate the wrongfulness of his actions and he did not lack the substantial capacity to conform his behavior to the requirements of the law." Fife opined that there was no indication that the defendant was experiencing hallucinations or delusional thinking on the day of the stabbing. She considered it significant that after the murder the defendant said nothing about being in fear for his life; in fact, he did not say anything that would indicate that "he was operating under a **46 paranoid, delusional thought process." To the contrary, he was "clear, coherent, and asking for help in a calm way."
The jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty.
Discussion. 1. Jury instructions. When the judge reached the substantive crimes at issue in the course of her final charge, she instructed the jury on the elements of murder in the first degree based on the theories of deliberate premeditation and extreme atrocity or cruelty, and murder in the second degree, mental impairment, and criminal responsibility. In doing so, the judge followed the Model Jury Instructions on Homicide (1999) (model instructions), which were operable at the time of the defendant's trial.
The defendant argues that the judge erred in instructing the jury on malice and the inference of sanity, where the defendant is a juvenile relying on the lack of criminal responsibility defense; the order in which she instructed the jury on the elements of murder, the defense of lack of criminal responsibility, and mental impairment ; and failing to give the defense's requested instruction concerning the consequences of a verdict of not guilty by reason of lack of criminal responsibility.
"When reviewing jury instructions, we 'evaluate the instruction as a whole, looking for the interpretation a reasonable juror would place on the judge's words' " (citation omitted). Commonwealth v. Vargas, 475 Mass. 338, 349, 57 N.E.3d 920 (2016). "We do not consider words from the instructions in bits and pieces or in isolation from one another." Id. With one exception, the defendant objected to the challenged instructions at trial. Therefore, we review for prejudicial error. Commonwealth v. Waweru, 480 Mass. 173, 187, 102 N.E.3d 391 (2018). "This means that we inquire whether there is a reasonable possibility that the error might have contributed to the jury's verdict" (quotation, citation and alteration omitted). Commonwealth v. Wolfe, 478 Mass. 142, 150, 83 N.E.3d 811 (2017). "An error is not prejudicial if it did not influence the jury, or had but very slight effect" (quotation and citation omitted). Id. See Commonwealth v. Oliveira, 445 Mass. 837, 845, 840 N.E.2d 954 (2006).
a. Instructions on malice and intent. As to malice, the judge instructed the jury: "As a general rule, you are permitted to infer that a person who intentionally uses a dangerous weapon on another person is acting with malice. A dangerous weapon is an item which is capable of causing serious injury or death. I instruct **47 you as a matter of law, the knife is a dangerous weapon." As to intent, she instructed *684 the jury: "[You] may but need not necessarily infer from the conduct of a person that he intended the natural and probable consequences of his own acts." The defendant argues essentially that the inclusion of these instructions was prejudicial error because the jury cannot infer malice and intent from the actions of a juvenile with multiple mental health diagnoses.
As a general rule, "[t]he jury are permitted to infer malice from the use of a dangerous weapon, even in connection with first prong (intent to kill) malice"[4] (quotations and citations omitted). Commonwealth v. Keown, 478 Mass. 232, 250, 84 N.E.3d 820 (2017), cert. denied, --- U.S. ----, 138 S. Ct. 1038, 200 L.Ed.2d 292 (2018). See Model Jury Instructions on Homicide 105 (2018) (providing instruction that jury may infer intent to kill from use of dangerous weapon). "It is a principle frequently cited with approval in our cases, including those where there is evidence of intoxication or mental impairment on the part of the defendant." Commonwealth v. Miller, 457 Mass. 69, 74, 927 N.E.2d 999 (2010), and cases cited. See, e.g., Commonwealth v. Szlachta, 463 Mass. 37, 45-46, 971 N.E.2d 1281 (2012). The inference must be presented as permissive. See Commonwealth v. Albert, 391 Mass. 853, 860-861, 466 N.E.2d 78 (1984) ("Certainly, the jury were entitled to infer malice from the intentional use of a deadly weapon, so long as the judge's instructions did not compel them to do so"). See also Commonwealth v. Dyous, 436 Mass. 719, 734-735, 767 N.E.2d 51 (2002). The same applies to the inference of intent. See Commonwealth v. Brown, 477 Mass. 805, 815-816, 81 N.E.3d 1173 (2017), cert. denied, --- U.S. ----, 139 S. Ct. 54, 202 L.Ed.2d 41 (2018) ("no constitutional infirmity where a jury instruction creates only a permissive inference" of intent). Here, the judge's instruction was in accordance with the model instructions and appropriately permissive and properly instructed the jury on the use of dangerous weapons. There was no error.
The defendant does not challenge as a general matter the principle that where a defendant purposefully uses a dangerous weapon to inflict fatal wounds, a jury may infer that the defendant acted with malice. He argues rather that the jury cannot infer either malice or intent from his actions because it presupposes that he is sane and "it ascribes [to him] an adult's ability to reason" in contravention of our holding in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 1 N.E.3d 270 (2013), S.C., 471 Mass. 12, 27 N.E.3d 349 (2015). We have discussed supra that such instructions **48 are appropriate in cases where evidence of mental impairment has been introduced so long as they clearly are permissive. See, e.g., Miller, 457 Mass. at 74-75, 927 N.E.2d 999. Therefore, we focus our attention on the import of the defendant's juvenile status.
"There is no question that our scientific and legal understanding of adolescent brain development has advanced since the defendant's trial." Commonwealth v. Fernandez, 480 Mass. 334, 341-342, 104 N.E.3d 651 (2018) (collecting cases). "It is now well established, based on 'science, social science, and common sense,' that adolescents are significantly different from adults for purposes of analysis under the Eighth Amendment to the United States Constitution." Id. at 342, 104 N.E.3d 651, quoting Diatchenko, 466 Mass. at 660, 1 N.E.3d 270. See Commonwealth v. Okoro, 471 Mass. 51, 59-60, 26 N.E.3d 1092 (2015)
*685 ("Scientific and social science research on adolescent brain development and related issues continues").
Notwithstanding the foregoing, "our acknowledgement that adolescents are constitutionally different from adults has been precisely limited to our consideration of juvenile sentencing, not whether a juvenile defendant is capable of committing murder." Fernandez, 480 Mass. at 342, 104 N.E.3d 651. Indeed, cases decided after Diatchenko, have established that juveniles are capable of formulating the intent to commit murder. See Commonwealth v. Brown, 474 Mass. 576, 590 & n.7, 52 N.E.3d 137 (2016) (rejecting argument that jury should be instructed that all juveniles incapable of forming intent for murder); Okoro, 471 Mass. at 65, 26 N.E.3d 1092 ("Legislature has clearly indicated that youth in the defendant's age group are considered capable of committing murder, and the trial judge was correct to preclude the defendant from putting forward evidence that would have suggested it was impossible for anyone the defendant's age to formulate the necessary intent to commit this crime"). See generally Commonwealth v. Ogden O., 448 Mass. 798, 804, 864 N.E.2d 13 (2007) ("While a delinquent child may not have the maturity to appreciate fully the consequences of his wrongful actions ..., that does not mean that a delinquent child lacks the ability to formulate the specific intent to commit particular wrongful acts"). At this juncture, we see no reason to alter the position articulated in Brown and Okoro, to grant the defendant's request that we except juveniles generally from application of our usual jury instructions. Moreover, we are satisfied that in the defendant's specific case the jury were made sufficiently aware of the impact that the defendant's age and various diagnoses might have had on his ability to form the requisite intent to kill. Indeed, his state of **49 mind was the central issue at trial. In short, we discern no error.[5]
b. Instruction on sanity. Concerning the inference of sanity, the judge instructed that "[i]n considering whether or not the defendant was sane, that is, criminally responsible, if you feel it appropriate you may take into account that the great majority of people are sane and that there is a resulting likelihood that any particular person is sane." The defendant maintains that including this instruction where the defendant is a juvenile relying on the lack of criminal responsibility defense and failing to instruct that the jury could reject this inference was prejudicial error because it unfairly bolstered the Commonwealth's case and critically undermined the defendant's only defense. We do not agree.
At the time of the defendant's trial, we required an instruction concerning the inference of sanity "in every case in which the question of the defendant's criminal responsibility [was] raised." Commonwealth v. Keita, 429 Mass. 843, 846, 712 N.E.2d 65 (1999). In this case, although the judge's instruction was consistent with the model instructions, see Model Jury Instructions on Homicide 51 (1999), since the defendant's trial, we have advised that "judges should not instruct juries regarding this inference." Commonwealth v. Lawson, 475 Mass. 806, 815 n.8, 62 N.E.3d 22 (2016). In that case we explained, "The inference that a defendant is probably sane because most people are sane is not strong enough alone to permit a rational *686 finder of fact to conclude that a defendant is criminally responsible beyond a reasonable doubt. Although it is probable that an individual selected randomly would be criminally responsible for his or her acts, that same probability would not attach to the tiny subset of the population who are criminal defendants with a long history of mental illness who proffer a defense of lack of criminal responsibility." Id. at 814, 62 N.E.3d 22. Thus, we subsequently held that such an instruction is erroneous, see, e.g., Waweru, 480 Mass. at 187, 102 N.E.3d 391 ; Commonwealth v. Muller, 477 Mass. 415, 431, 78 N.E.3d 51 (2017), and omitted the instruction from subsequent versions of the model instructions. See Model Jury Instructions on Homicide (2018); Model Jury Instructions on Homicide (2013). "Here, the defendant is entitled to the benefit of Lawson, as that case was released while the defendant's appeal was pending on direct review." Waweru, supra, quoting Muller, supra. As defense counsel objected at trial, we review for prejudicial error. See Waweru, supra. **50 We are satisfied that in this case the judge's instruction did not oblige or even encourage the jury to rely on the inference of sanity rather than the evidence presented to them in determining whether the defendant was criminally responsible, and read as a whole, her instructions sufficiently mitigated any risk of juror confusion concerning the burden of proof.
First, the judge prefaced the inference with explicitly permissive language that made clear to the jury that they were free to consider it, or not, as they saw fit. We conclude that it was unnecessary for her to instruct the jury that they also were free to reject the inference -- we are confident that a reasonable juror would have understood as much.[6] See Commonwealth v. Silva, 482 Mass. 275, 288, 121 N.E.3d 1266 (2019) (central to assessment of possible impact of alleged error is whether reasonable juror could have used instruction incorrectly). Second, she instructed that the jury "must decide the facts, solely and entirely," including "whether the defendant had a mental disease or defect." Third, and most importantly, she instructed the jury repeatedly and thoroughly that the Commonwealth had the burden to prove that the defendant was criminally responsible and that the defendant did not have the burden to prove that he was not criminally responsible. See Waweru, 480 Mass. at 187, 102 N.E.3d 391 (no prejudicial error where evidence overwhelming and judge "strongly and specifically instructed that the burden is on the Commonwealth to prove criminal responsibility beyond a reasonable doubt" [citation omitted] ). For example, she concluded her criminal responsibility instruction with, "Once again, I remind you, it is not up to the defendant to prove that he was not criminally responsible at the time of the crime. Remember that the burden of proof is on the Commonwealth to prove beyond a reasonable doubt that the defendant was criminally responsible."
We are satisfied that where the instruction was couched in permissive language and coupled with repeated, clear instructions concerning the Commonwealth's burden of proof, inclusion of the inference of sanity did not diminish the Commonwealth's standard of proof, undermine the defendant's lack of criminal responsibility defense, or otherwise prejudice the defendant. See Commonwealth v. Griffin, 475 Mass. 848, 863, 62 N.E.3d 490 (2016) (inference **51 of sanity instruction did not create *687 substantial likelihood of miscarriage of justice where judge "strongly and specifically" instructed that proof of criminal responsibility is Commonwealth's burden and where substantial evidence of guilt). See also Waweru, 480 Mass. at 187-188, 102 N.E.3d 391 (same); Muller, 477 Mass. at 431, 78 N.E.3d 51 (same).[7]
c. Order of instructions and instructions on mental impairment. The judge instructed on murder in the first degree by deliberate premeditation and with extreme atrocity or cruelty, on murder in the second degree, on mental impairment, and on lack of criminal responsibility, in that order. Immediately before the instruction on criminal responsibility, she stated: "If you are satisfied beyond a reasonable doubt ... that the defendant committed a crime, you must decide whether the Commonwealth ... prove[d] that the defendant was criminally responsible beyond a reasonable doubt," and she reiterated within her criminal responsibility instruction that "the issue of criminal responsibility arises only if the Commonwealth has proved beyond a reasonable doubt that the defendant has committed a crime."
The defendant argues in essence that, as a whole, the instructions regarding criminal responsibility and mental impairment were erroneous, were confusing, and undermined the defendant's only defense because the jury were instructed on those defenses only after she completed her instructions on the elements of murder, and instructed that the jury must consider whether the defendant committed a crime before they considered the defenses. We are not persuaded.
Although we do not require a specific order in jury instructions, we reiterate that "[i]t is generally preferable to instruct on the elements of a defense to a crime after describing the elements of the crime." Commonwealth v. Santiago, 425 Mass. 491, 506, 681 N.E.2d 1205 (1997), S.C., 427 Mass. 298, 693 N.E.2d 127 and 428 Mass. 39, 697 N.E.2d 979, cert. denied, 525 U.S. 1003, 119 S.Ct. 514, 142 L.Ed.2d 426 (1998). We also note that the sequence of the instructions in this case was consistent with the sequence of the model **52 instructions. Although the model instructions have been revised to afford the trial judge discretion to instruct the jury on criminal responsibility either before instructing on murder or within the murder instruction in cases where the defendant has conceded commission of the crime and where criminal responsibility is the only live issue for the jury to decide, we discern no error in this case where the instructions flowed logically and the discussion of criminal responsibility immediately followed the instructions concerning murder and mental impairment.[8] *688 In addition, we are not persuaded that instructing the jury, "If you are satisfied beyond a reasonable doubt ... that the defendant committed a crime, you must decide whether the Commonwealth ... prove[d] that the defendant was criminally responsible beyond a reasonable doubt," had the effect of "plac[ing] the jurors in an irreconcilable predicament, because a person who is not criminally responsible cannot be convicted of a crime." We do not read the judge's instruction as requiring that the jurors reach a conclusion concerning whether the defendant was guilty of murder before considering whether the defendant was criminally responsible. Rather, it obligated the jury to determine whether the Commonwealth proved that the defendant was criminally responsible beyond a reasonable doubt if the jury were satisfied that the defendant had committed a crime. Lack of criminal responsibility is not an element of any crime, see Lawson, 475 Mass. at 812, 62 N.E.3d 22 ; rather, it is a defense that operates to foreclose the possibility of a finding of guilty where the defendant's conduct would have constituted a crime but for the defendant's lack of criminal responsibility. It would not be incongruous then for a reasonable juror to conclude that a defendant had committed the act but nevertheless was entitled to a verdict of not guilty because he or she lacked the requisite criminal responsibility. Considered as a whole, and against the backdrop of a trial that focused almost exclusively on the defendant's criminal responsibility, we are confident that the jurors understood that they were obligated to **53 determine whether the Commonwealth proved that the defendant was criminally responsible beyond a reasonable doubt.
The defendant also argues that, to avoid juror confusion, the judge should have instructed the jury to consider evidence of the defendant's mental impairment each time that she instructed the jury on deliberate premeditation, on a prong of malice, and on a factor that the jury must consider in determining whether the defendant acted with extreme atrocity or cruelty.[9] We disagree.
After instructing the jury on the elements of murder in the first and second degrees, the judge instructed on "knowledge" and "intent" and stated that "[w]henever the Commonwealth must prove the defendant's intention to do something, you should consider any credible evidence of mental impairment in determining whether the Commonwealth has met its burden of proof." She continued, "Likewise, whenever the Commonwealth must prove the defendant's knowledge of any facts or circumstances, you should consider any credible evidence of mental impairment in determining whether the Commonwealth has met its burden of proof." She stated, "More particularly, you may consider any credible evidence of the defendant's mental impairment in determining whether the defendant deliberately premeditated the killing," and added for good measure: "I reiterate, whenever the Commonwealth must prove that the defendant intended to do something or had knowledge of certain facts and circumstances, in order to prove the crime, you may consider any credible evidence of mental impairment in determining whether the Commonwealth has met its burden ...."
*689 The judge's instructions flowed in a logical order and tracked the model instructions, which noted that when an instruction on mental impairment was required it need be given only once. Model Jury Instructions on Homicide 61 (1999). See Commonwealth v. Grey, 399 Mass. 469, 474, 505 N.E.2d 171 (1987) (defendant is entitled to instruction that jury could consider defendant's mental condition whenever Commonwealth has burden of proving defendant's specific intent to cause particular result). This is not a case like Commonwealth v. Berry, 466 Mass. 763, 773 n.17, 2 N.E.3d 177 (2014), where we determined that the judge's timing of the mental impairment instruction had the potential to be confusing because the instruction "was so separated from its intended context that it is somewhat questionable whether the jury actually made the link." We **54 do not have that concern here. There was no error.
d. Instruction concerning consequences of verdict of not guilty by reason of lack of criminal responsibility. The defendant maintains that it was error for the judge to reject his proposed instruction concerning the consequences of a not guilty verdict by reason of lack of criminal responsibility and instruct from the model instructions instead.[10] ,[11] This claim is without merit.
Since the defendant's trial, we have determined that the model instruction concerning the consequences of a verdict of not guilty by reason of lack of criminal responsibility, which was derived from Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12, 323 N.E.2d 294 (1975) ( Mutina instruction), should be modified to inform the jury: "There is no limit to the number of such renewed orders of commitments as long as the defendant continues to be mentally ill and dangerous; if these conditions do continue, the defendant may remain committed for the duration of his [or her] life." Commonwealth v. Chappell, 473 Mass. 191, 209, 40 N.E.3d 1031 (2015) (Appendix). See Commonwealth v. Dunn, 478 Mass. 125, 139, 84 N.E.3d 1 (2017). Our holding in Chappell, supra at 205-206, 40 N.E.3d 1031, was prospective only, and we have concluded that it is not error for a judge to give this instruction in accordance with the operable model jury instructions. See Waweru, 480 Mass. at 188-189, 102 N.E.3d 391 ; Dunn, supra. We discern no error in this case.[12]
*690 2. Recorded conversations. From January 19, 2007, to September 1, 2007, the defendant was held without bail in a Department **55 of Youth Services facility (facility). Pursuant to the telephone use policy of the facility, all telephone calls made by a juvenile to outside telephone numbers and conversations between the juvenile and visitors in the facility's visitor's room, which take place by telephone, are monitored and recorded, with the exception of conversations between the juvenile and his attorneys or clergy.
In advance of trial, the Commonwealth subpoenaed recordings of the defendant's telephone calls for the period from January 19 to July 31, 2007. The defendant moved to suppress these recordings, which he represented included over 2,000 minutes (33.3 hours) of conversations between the defendant and his family and his friends, arguing that the procedures by which the district attorney's office obtained the recordings constituted an abuse of the district attorney's subpoena power and that the sheriff's disclosure of the jail recordings violated the defendant's Federal and State constitutional rights. The judge granted the defendant's motion. We need not belabor the extensive procedure that followed, which was detailed in Commonwealth v. Odgren, 455 Mass. 171, 172-176, 915 N.E.2d 215 (2009). It suffices to say that we reversed and remanded the matter for consideration of the defendant's contention that the disclosure of the recordings without a finding of probable cause violated his State and Federal constitutional rights. Id. at 189, 915 N.E.2d 215.
On remand, the motion judge, who was also the trial judge in this case, denied the defendant's motion to suppress, reasoning that (1) he did not retain a privacy interest in the use of the recordings, even when considering his age and mental health diagnoses; (2) the recordings did not impinge on his right to communicate with his family and friends; and (3) he was not unconstitutionally deprived of due process. At the suppression hearing, the Commonwealth introduced fifty-three excerpts of recorded conversations, totaling 138 minutes, that took place on and between January 23 and April 5, 2007. The defendant supplemented the evidence with excerpts of conversations, totaling seventeen minutes, that took place on and between January 23 and March 29, 2007.
At trial, the Commonwealth introduced portions of eleven recordings over the defendant's objections on relevancy and undue prejudice grounds. These recordings captured conversations covering various topics between the defendant and his **56 family and friends.[13] In addition, the Commonwealth's expert reviewed recordings for the period from January 19 to April 5, 2007, and relied on those recordings in assessing the defendant's criminal responsibility.
On appeal, the defendant argues that the judge should have suppressed the recordings *691 at the outset because disclosure of the recordings without a finding of probable cause violated his constitutional right to privacy under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights and his right to communicate with friends and family under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Constitution. He renews also his relevancy and prejudice arguments. We address each in turn.
a. Motion to suppress. "In reviewing a decision on a motion to suppress, we accept the judge's subsidiary findings absent clear error but conduct an independent review of [the] ultimate findings and conclusions of law" (quotations omitted). Commonwealth v. Gallett, 481 Mass. 662, 667, 119 N.E.3d 646 (2019), quoting Commonwealth v. Jones-Pannell, 472 Mass. 429, 431, 35 N.E.3d 357 (2015). The motion judge found the following.
Inmates at the facility are permitted to place and receive telephone calls in accordance with facility procedures. When an inmate enters the facility, staff gives him a form entitled, "Inmate List of Designated Telephone Numbers." The inmate is permitted to list up to ten individuals to whom he wishes to make telephone calls. The defendant listed the names, relationships, and telephone numbers of ten individuals: he listed four individuals or groupings of individuals as parents and family and six individuals as friends.
**57 The jail administrator then assigns an inmate personal identification number (IPIN) for the inmate's use when making telephone calls. The form also provides in a separate box for the listing of the names and telephone numbers of attorneys and clergy whom the inmate wishes to call; these calls are neither monitored nor recorded. Below this box is the following language both in English and Spanish: "Your acceptance of the IPIN and use of the inmate telephones will be deemed as consent to the conditions and restrictions upon inmate telephone calls, including call monitoring, recording, and call detail." Immediately below the warning and acceptance is a line for the inmate's signature. A message preceding every telephone call also warns the parties that the call is subject to monitoring and recording.
In-person visits to inmates take place over a telephone, and a glass partition separates the inmate and the visitor. At the start of the conversation, the parties hear the following: "This call is subject to monitoring and recording." There are no contact visits (except with attorneys and clergy) at the facility. There is no monitoring of outgoing mail; facility staff opens, but does not read, incoming mail to inspect for contraband.
In addition, facility inmates are permitted, at a minimum, one call per week of at least ten minutes in duration that is not recorded. Facility staff visually monitor the inmates during these calls. Between January 20, 2007, and March 4, 2007, the defendant placed eight telephone calls that were not recorded.
i. Right to privacy under the Fourth Amendment and art. 14. The defendant argues that the recordings should have been suppressed because, although he was aware that his conversations were being recorded, he retained a reasonable expectation that they would not be disseminated absent a specific reason for disclosure related to some institutional security interest. The judge determined that "the relevant question is not whether pretrial detainees or inmates generally retain a privacy interest in the uses to which their *692 recordings are put (based on this court's interpretation of the current law, they do not), but rather whether the defendant's age and disability influenced his personal expectations regarding the recording and dissemination of his conversations such that his privacy interests are entitled to heightened protection."
She determined that "the defendant had effective notice that his calls and visits were subject to monitoring and recording by correctional facility personnel;" "his age and disability did not prevent **58 him from being able to appreciate the fact that others, including prosecutors, might have access to his conversations with friends and family;" he "is a very bright individual whose conversations reflect a level of sophistication well beyond that of most sixteen year olds;" his "numerous references to the fact of recording and monitoring are persuasive evidence that he understood and appreciated that his privacy was curtailed;" and his "restraint in the content of his conversations concerning the crime further evidence[d] his awareness for the need to be circumspect."[14] She concluded that "the defendant had no actual, objectively reasonable expectation of privacy in his recorded conversations that would prevent their dissemination." We agree.
We held in Matter of a Grand Jury Subpoena, 454 Mass. 685, 912 N.E.2d 970 (2009) ( Grand Jury Subpoena ), and reiterated in Commonwealth v. Hart, 455 Mass. 230, 914 N.E.2d 904 (2009), that "the constitutional rights of an adult pretrial detainee ... are not violated when the sheriff provides copies of the detainee's recorded telephone calls in response to a subpoena, provided that all parties have notice that the calls are subject to monitoring and recording, and the monitoring and recording is justified by legitimate penological interests." Hart, supra at 244, 914 N.E.2d 904, citing Grand Jury Subpoena, supra at 687-688, 692-693, 912 N.E.2d 970. See Grand Jury Subpoena, supra (no privacy interest, under Fourth Amendment or art. 14, in contents of recorded telephone calls).[15] See also Commonwealth v. Fitzpatrick, 463 Mass. 581, 602, 977 N.E.2d 505 (2012) (same). This is because a privacy interest protected under the Fourth Amendment and art. 14 exists only where a person demonstrates a subjective expectation of privacy and that that expectation is one that society is prepared to recognize as reasonable. Grand Jury Subpoena, supra at 688, 912 N.E.2d 970, citing Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). If an inmate is on notice that his conversations are subject to monitoring and recording, then he does not have a subjective expectation of privacy in those conversations that society is prepared to recognize as reasonable. Grand Jury Subpoena, supra, citing United States v. Van Poyck, 77 F.3d 285, 290-291 (9th Cir.), **59 cert. denied, 519 U.S. 912, 117 S.Ct. 276, 136 L.Ed.2d 199 (1996), and United States v. Amen, 831 F.2d 373, 379-380 (2d Cir. 1987), cert. denied sub nom. Abbamonte v. United States, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988).
In Commonwealth v. Gomes, 459 Mass. 194, 206, 944 N.E.2d 1007 (2011), we rejected *693 the argument that such recordings could be used "to further the legitimate penological and security interests of the sheriff" only, and "not for the prosecutorial purposes of the district attorney." Id. at 206-207, 944 N.E.2d 1007 (dissemination of detainee's recorded telephone conversation did not violate detainee's constitutional rights). See United States v. Eggleston, 165 F.3d 624, 626 (8th Cir.), cert. denied, 526 U.S. 1031, 119 S.Ct. 1280, 143 L.Ed.2d 373 (1999) ("The defendant concedes that he agreed to the recording and monitoring of the calls, but argued that he did not consent to their use in evidence against him. We do not think that the loaf can be sliced so thin. If someone agrees that the police may listen to his conversations and may record them, all reasonable expectation of privacy is lost, and there is no legitimate reason to think that the recordings, like any other evidence lawfully discovered, would not be admissible").
Similarly, in Commonwealth v. Rosa, 468 Mass. 231, 242-243, 9 N.E.3d 832 (2014), we rejected the argument that, in accordance with the First and Fourth Amendments, "before evidence of a call may be used against a defendant at trial, the government must establish that the monitoring of that particular call was justified as advancing such a legitimate purpose.... [T]his concept would be antithetical to the prophylactic purpose of the regulation, because it is at best difficult (and more likely impossible) to identify in advance specific telephone calls that may raise safety and security issues." Id. at 243-244, 9 N.E.3d 832. Both holdings were underpinned by our determination that adult detainees do not maintain an objective privacy interest in recordings of their conversations, under either the Federal or State Constitution, when they are on notice that their conversations are subject to monitoring or recording.
The defendant urges us to conclude that, by virtue of his juvenile status, he retained a reasonable expectation that recordings of his conversations would not be disseminated absent a specific reason for disclosure related to some institutional security interest. We decline to do so. The judge found that the defendant was effectively on notice, and in fact understood, that his telephone conversations were subject to monitoring and recording with some exceptions. Critically, he had alternative, private means of communication available. The judge also found **60 that neither the defendant's youth nor his mental health diagnoses prevented him from understanding that his conversations were not private. In these circumstances, even taking the defendant's age and mental health diagnoses into account, the defendant does not have a subjective expectation of privacy in the content of his recorded conversations that society is prepared to recognize as reasonable. In Cortez v. State, 240 S.W.3d 372, 383 (Tex. App. 2007), for example, police allowed a juvenile who was in custody to telephone his mother; during the conversation he told her about a shooting in which he had been involved. The juvenile did take any precautions to ensure his privacy but objected to the conversation being used at his trial. The court stated, "Although appellant's juvenile status may have entitled him to rights and considerations not afforded adults under the same circumstances, we do not believe that society is prepared to accept as reasonable appellant's subjective belief that he could sit in a police interview room and discuss on the telephone his role in a murder for which he had been arrested without being overheard by the police, at least in the absence of any evidence of police conduct intended to give appellant the impression that his conversation would be private". Id. See Dickerson v. State, 292 Ga. App. 775, 779, 666 S.E.2d 43 (2008) (juvenile arrested *694 for armed robbery had no subjective expectation of privacy in conversation with his mother in interrogation room, and thus video recording of conversation was admissible at juvenile's subsequent trial, where officers made "no representations or inquiries ... as to privacy or confidentiality" and juvenile and mother made no attempt to "make the[ir] conversation private"). Contrast People v. A.W., 982 P.2d 842, 848 (Colo. 1999) (detective's assurances that "nothing or nobody" was behind two-way mirror in interview room, and "that he would not be listening in," gave rise to juvenile's subjectively and objectively reasonable expectation of privacy in statements he made to his father). Accordingly, we discern no Fourth Amendment or art. 14 violation.[16] See Rosa, 468 Mass. at 242-243, 9 N.E.3d 832 ; **61 Gomes, 459 Mass. at 206-207, 944 N.E.2d 1007.
ii. Right to communicate under the First Amendment and art. 16. The defendant also argues that dissemination of the recordings without probable cause impermissibly impinged on his First Amendment and art. 16 right to communicate with family and friends, which he maintains necessarily entails the right to communicate with them privately. We disagree.
We recognize that "persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends." Washington v. Reno, 35 F.3d 1093, 1100 (6th Cir. 1994), citing Morgan v. LaVallee, 526 F.2d 221, 225 (2d Cir. 1975). "Criteria which have been established by the United States Supreme Court for judging claims arising under the First Amendment ... are equally appropriate to claims brought under cognate provisions of the Massachusetts Constitution" (citation omitted). See Doe, Sex Offender Registry Bd. No. 10800 v. Sex Offender Registry Bd., 459 Mass. 603, 623-624, 947 N.E.2d 9 (2011). Certainly, the defendant's relationship and ability to communicate with his parents warrants some degree of protection. See Dunn v. Castro, 621 F.3d 1196, 1205 (9th Cir. 2010) ("The relationship between a father or mother and his or her child, even in prison, merits some degree of protection"); Wirsching v. Colorado, 360 F.3d 1191, 1201 (10th Cir. 2004) (same).
Nonetheless, "freedom of association is among the rights least compatible with incarceration," and "[s]ome curtailment of that freedom must be expected in the prison context." Overton v. Bazzetta, 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). See Commonwealth v. Ecker, 92 Mass. App. Ct. 216, 220, 84 N.E.3d 883 (2017), quoting Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 770 n.10, 665 N.E.2d 85 (1996) ("Although 'prison inmates retain certain constitutional rights,' those rights are necessarily limited by '[t]he fact of confinement as well as *695 the legitimate goals and policies of the penal institution' "); Dunn, 621 F.3d at 1202 (incarceration brings about necessary withdrawal or limitation of many privileges and rights, including right to associate with individuals with whom inmate would otherwise enjoy close personal and professional relations outside of prison context). See also, e.g., **62 Commonwealth v. Jessup, 471 Mass. 121, 133, 27 N.E.3d 1232 (2015) (policy precluding inmate-to-inmate correspondence did not violate First Amendment); Ecker, supra at 219-220, 84 N.E.3d 883 (policy authorizing censorship of inmate mail did not run afoul of First Amendment).
In this case, we agree with the judge that the Commonwealth's ability to secure recordings of conversations between the defendant and his parents could constrain the defendant's ability to seek counsel from his parents concerning his defense, at least by means of the telephone. The defendant presses the argument, without citation to authority, that his protected constitutional right to communicate with family and friends necessarily entails the right to communicate with them privately. We are not persuaded, particularly to the extent that such a right extends to friends. Nevertheless, we need not decide the question here because in this case, as noted by the judge, the defendant had available to him alternative means to communicate with his parents privately. His outgoing and incoming mail was not read by facility staff; he had near unfettered access to his attorneys, who could act as liaisons between the defendant and his parents; and he had access to, at minimum, one unrecorded telephone call per week.[17] In short, the defendant was not, as he claims, "forc[ed] ... to choose between his fundamental right to maintain and engage in intimate family relationships, or to be held incommunicado pending trial." In these circumstances, we discern no violation of the First Amendment or art. 16.
b. Relevancy and undue prejudice. The defendant argues that the recordings should not have been admitted because they were "largely irrelevant" and more prejudicial than probative, in that they captured the defendant's "inappropriately blithe tone" and peculiar "affect," which were likely to offend and alienate the jury.[18] We disagree.
**63 "Whether evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." Keown, 478 Mass. at 242, 84 N.E.3d 820, quoting Commonwealth v. Sylvia, 456 Mass. 182, 192, 921 N.E.2d 968 (2010). See Brown, 474 Mass. at 588, 52 N.E.3d 137. "An abuse of discretion occurs only where the judge makes a clear error of judgment in weighing the factors relevant to the decision ..., such that the decision falls outside the range of *696 reasonable alternatives" (quotations and citation omitted). Keown, supra.
The judge did not abuse her discretion in determining that the recordings were relevant to show, among other things, state of mind, premeditation, consciousness of guilt, and knowledge of relevant evidence. Nor did she abuse her discretion in determining that the recordings were not "unduly prejudicial." Rosa, 468 Mass. at 241, 9 N.E.3d 832. Before trial, the judge reviewed the Commonwealth's proposed recordings and addressed each in turn, hearing arguments from both parties. Although the judge allowed several calls, she also excluded or redacted others, and reserved her ruling on certain calls to determine their relevancy and probative value during trial.[19] It is evident in the transcripts that the judge, in her calculus, weighed relevancy and probative value very carefully, and monitored closely the Commonwealth's use of the recordings during trial. We discern no error.
3. Review under G. L. c. 278, § 33E. Finally, after a thorough review of the record, we find no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or either to reduce or set aside the verdict of murder in the first degree.[20]
**64 Conclusion. For the foregoing reasons, we affirm the defendant's conviction.
Judgment affirmed.

The defendant made similar statements to police officers shortly after the stabbing: "Is he still alive? He should be alive," and "I can't believe I did it. Is he okay?"

Specifically, Barnum testified the defendant "had two different psychiatric diagnoses," "Asperger's disorder" and "what's referred to as mood disorder not otherwise specified, which basically refers to significant symptoms of depression and emotional instability that don't fit exactly with the other defined criteria for depression or bipolar disorder." It was Barnum's opinion that the defendant's "agitation and anxiety and disorganization of emotional functioning and thinking were so severe that [at the time of the stabbing] he was essentially psychotic." The defendant could not "recognize what was real," he was not thinking coherently, and "his emotions were completely overwhelming him," resulting in an inability to control his actions.

Greene testified that the defendant had a "long-standing diagnosis of Asperger's disorder," and opined that at the time of the stabbing, the defendant "was experiencing a brief psychotic episode." Greene also opined that "in the time leading up to the crime," the defendant "also had a psychotic process going on that included delusional beliefs." He was becoming "increasingly anxious about social situations, sometimes depressed about them, and increasingly worried about the intentions of others, what peoples' intentions were, even fear of being attacked." Greene explained that, as a result of the mounting anxiety that the defendant was experiencing, he withdrew into a "world of his own making" and his preoccupation with Stephen King novels and the number nineteen fueled his delusion that something "cataclysmic" would happen on the day of the stabbing.

The defendant does not dispute that the knife is a dangerous weapon.

Because we find that the judge's inclusion of each instruction was not error, we need not address the defendant's argument that he preserved his objection to the instruction on intent.

We do not agree with the defendant that the judge presented the inference as a judicially noticed fact. See Commonwealth v. Lawson, 475 Mass. 806, 814, 62 N.E.3d 22 (2016) (so-called "presumption of sanity" is "accurately characterized as an inference").

The defendant urges us also to conclude that the inference of sanity is particularly problematic as applied to juveniles because the "great majority of people" is even less reflective of the subset of the population who are juvenile criminal defendants asserting a lack of criminal responsibility defense. Although it is entirely possible that the inference of sanity is even weaker as applied to juveniles than it is as applied to adults, it does not alter our conclusion that in this case inclusion of the inference did not substantially sway the judgment of the jury. See Commonwealth v. Cruz, 445 Mass. 589, 591, 839 N.E.2d 324 (2005).

Our current Model Jury Instructions on Homicide 1 (2018) include the following note to the judge: "Where there is evidence of lack of criminal responsibility, [the criminal responsibility] instruction, at the discretion of the judge, may be given as a stand-alone instruction prior to the murder instruction or inserted within the murder instruction. In deciding when to give this instruction, a judge may wish to consider whether the defendant has conceded that he committed the crime and whether the only live issue for the jury to decide is the defendant's criminal responsibility." See Model Jury Instructions on Homicide 1 (2013) (same).

This factor is "whether the defendant was indifferent or took pleasure in the suffering of [the victim]."

The judge instructed: "In the event that the defendant is found not guilty by reason of lack of criminal responsibility, the district attorney or other appropriate authority may petition this court under our statutes for his commitment to a facility for the care and treatment of mentally ill persons or commitment to Bridgewater State Hospital for care and treatment. If upon such a petition, [t]he [c]ourt finds that the defendant is mentally ill at the present time and that his discharge would create a likelihood of serious harm to himself or others, then the defendant would be committed to a facility or to the strict security in Bridgewater State Hospital in appropriate cases. The order of commitment is thereafter periodically reviewed by the courts of the Commonwealth."

The defendant requested that the judge modify the usual model instruction in several respects; most substantively, he sought the addition of language that would inform the jury (1) of the time period that the defendant would be held for observation prior to a petition for commitment to the court, (2) that there is no limit as to how long he could be committed, and (3) that he would not be discharged unless a finding was made by a judge that he was sane and able to resume a normal life. The defendant requested also that the instruction be given at the start of the trial in addition to the close.

We note that in this case the judge questioned prospective jurors on their attitudes toward the "insanity defense," substantially limiting the risk that jurors with a bias against the defense would be seated, and gave the jury a preliminary instruction on criminal responsibility at the outset of the trial.

The topics included the following: a Viking battle that the defendant had learned about in class; execution of a search warrant related to a list of items for the end of the world that the defendant had written in a notebook as a "joke"; the significance to the defendant of the number nineteen; the defendant leaving a certain Internet community days before the stabbing; the defendant's Internet and computer usage; discussion of an archaic prisoner punishment; the defendant positing that he did not know why he did not use a different bathroom on the day of the murder; the defendant denying that he had stabbed the victim; the defendant demonstrating that he was aware that he was being recorded; the defendant suggesting that, at "worst," the stabbing was manslaughter because it was not an act of passion and it was not premeditated; and the defendant acknowledging that he did not know the victim.

She noted that, "[i]n the two hour[s] and twenty-five minutes of conversation excerpts introduced for consideration, the total time of references to the crime is less than a few minutes."

In Matter of a Grand Jury Subpoena, 454 Mass. 685, 686, 912 N.E.2d 970 (2009) (Grand Jury Subpoena ), a grand jury subpoena was at issue. We clarified in Commonwealth v. Hart, 455 Mass. 230, 244 n.13, 914 N.E.2d 904 (2009), that our reasoning in Grand Jury Subpoena applies equally to a trial subpoena.

Although not apposite here, G. L. c. 233, § 20, concerning competency of witnesses, was amended recently to provide in pertinent part:
"A parent shall not testify against the parent's minor child and a minor child shall not testify against the child's parent in a proceeding before an inquest, grand jury, trial of an indictment or complaint or any other criminal, delinquency or youthful offender proceeding in which the victim in the proceeding is not a family member and does not reside in the family household; provided, however, that for the purposes of this clause, 'parent' shall mean the biological or adoptive parent, stepparent, legal guardian or other person who has the right to act in loco parentis for the child ...."
G. L. c. 233, § 20, Fourth, inserted by St. 2018, c. 69, § 111. We note, without deciding, that this statutory disqualification may have implications for covered parent-child communications sought through court order.

There was also evidence that on at least one occasion the facility allowed the defendant to speak with his parents out of earshot of facility staff.

The defendant goes so far as to characterize the recordings as impermissible bad character evidence. See Mass. G. Evid. § 404(a) (2019) ("Evidence of a person's character or a character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait"). We are not persuaded. As the defendant notes in his brief, his inability to conform his conversations to accepted social norms was presented to the jury as a well-recognized symptom of his Asperger's disorder. We conclude that an "inappropriately blithe tone" and peculiar "affect" are not indicative of a propensity to commit murder, and conclude that a reasonable juror would not have made such a connection.

In total, the judge admitted eleven recordings amounting to less than fifteen minutes.

Concerning our review pursuant to G. L. c. 278, § 33E, the defendant argues that "serious errors in the instructions and evidentiary rulings, as well as other factors at play during the trial, undermined the jurors' ability to fairly judge the evidence presented." The "other factors" include that (1) the judge and the Commonwealth shifted the jury's focus away from the defendant's youth by preventing defense counsel from referring to him as a "child" or "boy" despite the United States Supreme Court's determination that significant characteristics differentiate juveniles from adult offenders; and (2) the Commonwealth inflamed the jury and made appeals to juror sympathy with "unabashed efforts to compare the victim's lovability with [the defendant's] characteristics" and with an impassioned closing argument. Neither requires prolonged discussion. There is no danger that the jury were unaware that the defendant was a sixteen year old student at the time he stabbed the victim, and we presume that the jury heeded the judge's instruction that they must not be swayed by any sympathy, emotion, bias, or prejudice in reaching a verdict. See Commonwealth v. Keown, 478 Mass. 232, 243, 84 N.E.3d 820 (2017), cert. denied, --- U.S. ----, 138 S. Ct. 1038, 200 L.Ed.2d 292 (2018) ("We presume that a jury understand and follow limiting instructions" [citation omitted] ).