SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. ANTHONY GOVAN

 
 Docket:
 SJC-13600
 
 
 Dates:
 November 4, 2024 – June 4, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Global Positioning System Device. Constitutional Law, Search and seizure, Privacy. Search and Seizure, Expectation of privacy. Privacy. Practice, Criminal, Motion to suppress.
 
 

             Indictments found and returned in the Superior Court Department on February 26, 2021.
            A pretrial motion to suppress evidence was heard by Catherine H. Ham, J., and conditional pleas of guilty were accepted by her.
            The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.
            Benjamin Brooks for the defendant.
            Mackenzie Slyman, Assistant District Attorney (Tiffany R. Albanese, Assistant District Attorney, also present) for the Commonwealth.
            Matthew Spurlock, Committee for Public Counsel Services, Jessie J. Rossman, Nathan Freed Wessler, Kit Walsh, & Sara Silva, for American Civil Liberties Union & others, amici curiae, submitted a brief.
            GAZIANO, J.  This case concerns the admissibility of location data gleaned from a global positioning system (GPS) device imposed on a defendant as a condition of pretrial release.  We are called upon to resolve a question left unanswered by Commonwealth v. Norman, 484 Mass. 330 (2020):  where the initial imposition of GPS monitoring as a condition of pretrial release is a constitutional search under art. 14 of the Massachusetts Declaration of Rights, is the subsequent warrantless retrieval and review of twenty minutes to one hour of GPS location data indicating proximity to a crime scene for the purpose of conducting a criminal investigation also a search under art. 14?  For the reasons herein given, we conclude that it is not.[1],[2]
            1.  Background.  We summarize the facts as found by the motion judge, supplemented by uncontroverted evidence that the judge explicitly or implicitly credited.  See Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).
            On December 26, 2019, police officers responded to a call reporting domestic violence in the Jamaica Plain section of Boston; the defendant's ex-wife, C.P., stated that she and the defendant got into a heated argument in which the defendant said that he would "shoot her family's faces off."  Additionally, according to C.P.'s fifteen year old daughter, the defendant said to C.P. that "[y]ou can testify against me and get killed or leave it."  During the argument, C.P. heard a gun discharge after seeing the defendant remove a firearm from his pants and place it on a window ledge; a bullet hole was subsequently found in the apartment's window.  After hearing the gunshot, C.P. and her daughter left the apartment, but the defendant followed them, grabbing C.P. by the jacket collar and breaking her zipper.  Returning to the apartment alone, the defendant continued to send C.P. text messages in which he asked her to come back to the apartment and told her that he had gotten rid of the firearm.
            Following the December 26 incident, a "straight" warrant for the defendant was issued.  However, the defendant was not apprehended until July 2020, when he was stopped on a motor vehicle infraction.  The defendant posted the $1,000 bail and on July 14 appeared in court, where he was arraigned on charges of carrying a firearm without a license, in violation of G. L. c. 269, § 10 (a); discharging a firearm within 500 feet of a dwelling, in violation of G. L. c. 269, § 12E; assault and battery on a family or household member, in violation of G. L. c. 265, § 13M (a); and intimidation of a witness, in violation of G. L. c. 268, § 13B.  At the July 14 hearing, the defendant was advised of the potential for bail revocation under G. L. c. 276, § 58B.  The Commonwealth moved for a dangerousness hearing under G. L. c. 276, § 58A, and the hearing was scheduled for July 17, 2020.  During the three-day interim period prior to the scheduled dangerousness hearing, the defendant was held without bail.
            On July 17, 2020, the Commonwealth withdrew its request to proceed under G. L. c. 276, § 58A, on the ground that the defendant had agreed to conditions of release that would protect the safety of the community.  These conditions, to which the defendant's attorney agreed on the record, were "GPS prior to release," "[s]tay away, no contact, no abuse of alleged victim," and "[n]o possession of a firearm without a valid license."  The prosecutor relayed that C.P. confirmed that the defendant had not had any contact with her since the December 26 incident.  When asked for the geographic details of the exclusion zone with which to configure GPS monitoring, the prosecutor stated that C.P. had not shared her address with the Commonwealth, but that if an address were shared, the Commonwealth would ask that it be impounded.  At the hearing, the defendant did not object to any such future impoundment order.  The judge imposed the agreed-upon conditions of release as well as an additional condition:  "[s]tay away from victim, if defendant finds out address he is to stay away."
            Several weeks later, at approximately 1:30 A.M. on August 1, 2020, Boston police Detective Kevin Plunkett responded to a report of shots fired at a location in the Dorchester section of Boston, where ballistics evidence was located.  Several days later, Plunkett obtained surveillance video footage from traffic cameras and a nearby pizza restaurant.  The footage showed an interaction between occupants of two parked cars, a black Chevy Malibu and a nearby silver Chevy Malibu, that culminated in an exchange of gunfire, after which both cars left the scene.  Surveillance footage enabled the identification of the male shooter from the silver car, but did not enable identification of the male shooter from the black car apart from indicating short stature.  The defendant is five feet, five inches tall.
            On August 7, 2020 -- six days after the shooting incident - Plunkett sent an e-mail message to the probation service's electronic monitoring program (ELMO) requesting location data for anyone on GPS who was near the location of the Dorchester shooting incident on August 1, 2020, from 1:20 A.M. to 1:40 A.M.  After noting that the defendant was one of five individuals whose GPS location data corresponded to the requested location, date, and time, and that the defendant's approximate movements appeared to correspond to those of the suspect from the black car, Plunkett requested the defendant's precise GPS points from 1:15 A.M. to 2:15 A.M. on August 1, 2020.  ELMO sent the defendant's GPS points from 1 A.M. to 2 A.M., which Plunkett concluded matched the movements of the suspect from the black car.  After obtaining video camera footage from the vicinity of the defendant's home address that depicted a black Chevy "pull into the area" at approximately 1:45 A.M. on August 1, 2020, Plunkett requested an arrest warrant for the defendant.
            On February 26, 2021, a Suffolk County grand jury indicted the defendant on the following charges stemming from the August 1 shooting incident:  carrying a firearm without a license in violation of G. L. c. 269, § 10 (a); carrying a loaded firearm without a license, in violation of G. L. c. 269, § 10 (n); and assault by means of a dangerous weapon, in violation of G. L. c. 265, § 15B.[3]  On December 28, 2022, he defendant filed a motion to suppress evidence obtained from the review of his GPS location data.  On February 28, 2023, the motion judge denied the defendant's motion to suppress following an evidentiary hearing.  On March 28, 2023, the defendant entered a conditional plea whereby he pleaded guilty to all counts while reserving his right to appeal from the denial of his motion to suppress.  The defendant filed his notice of appeal on April 7, 2023.  After the defendant's case was entered in the Appeals Court on September 19, 2023, we transferred the case sua sponte.
            2.  Discussion.  This case presents two issues.  The first is whether the initial imposition of GPS monitoring on the defendant as a condition of pretrial release constituted an unreasonable search under art. 14.  The second is whether the subsequent retrieval and review of the defendant's historical location data following the August 2020 shooting incident constituted an unreasonable search under art. 14.  We address each issue in turn.
            a.  The initial imposition of GPS monitoring.  The government performs a search whenever it intrudes on a "subjective expectation of privacy . . . that society is prepared to recognize as reasonable."  Commonwealth v. Odgren, 483 Mass. 41, 58 (2019).  Moreover, "[u]nder the Federal and Massachusetts Constitutions, individuals have a reasonable expectation of privacy in the whole of their physical movements" (quotation and citation omitted).  Norman, 484 Mass. at 334.  In light of that reasonable expectation of privacy in the whole of one's physical movements, the imposition of GPS monitoring as a condition of probation is a search under the Fourth Amendment to the United States Constitution and art. 14.  See Commonwealth v. Feliz, 481 Mass. 689, 690-691 (2019), S.C., 486 Mass. 510 (2020) (Feliz I).  See also Grady v. North Carolina, 575 U.S. 306, 309 (2015) ("a State . . . conducts a search [under the Fourth Amendment] when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements"); Commonwealth v. Johnson, 481 Mass. 710, 717, cert. denied, 140 S. Ct. 247 (2019) ("GPS location data yields a treasure trove of very detailed and extensive information about the individual's 'comings and goings' for law enforcement" [quotation and citation omitted]).  Likewise, we have held that the imposition of GPS monitoring as a condition of release during stay of execution of a sentence pending resolution of a new trial motion is a search.  Garcia v. Commonwealth, 486 Mass. 341, 353 (2020).  And we have held that "[t]he imposition of GPS monitoring as a condition of pretrial release is a search under art. 14."  Norman, supra at 335.
            Because the imposition of GPS monitoring on the defendant as a condition of pretrial release was a search, and it was conducted without a warrant, it was "presumptively unreasonable and, therefore, presumptively unconstitutional" (quotation and citation omitted).  Commonwealth v. White, 475 Mass. 583, 588 (2016).  In finding that the imposition of GPS monitoring was constitutional, the motion judge cited two grounds overcoming this presumption of unreasonableness.  The first was that the defendant validly consented to the imposition of GPS monitoring.  "[C]onsent can justify a warrantless search."  Norman, 484 Mass. at 335.  The second was that the legitimate governmental interests advanced by GPS monitoring outweighed the intrusion on the defendant's privacy.  "For a warrantless search to be permissible under art. 14, the legitimate governmental interests must outweigh the level of intrusion."  Id. at 339.
            We "review independently the application of constitutional principles to the facts found" (citation omitted).  Commonwealth v. Mauricio, 477 Mass. 588, 591 (2017).  Here, we conclude that the imposition of GPS monitoring on the defendant was reasonable, and therefore constitutional, because it advanced legitimate governmental interests to a degree that outweighed the level of intrusion on the defendant's privacy.  See Feliz I, 481 Mass. at 700-702 (articulating interest-balancing test for art. 14 assessment of GPS monitoring imposition).  Therefore, we do not reach the separate question whether the Commonwealth satisfied its burden of showing that the defendant validly consented to GPS monitoring.  See Commonwealth v. Buckley, 478 Mass. 861, 875 (2018) ("the Commonwealth bears the burden of proof that consent was freely and voluntarily given, meaning it was unfettered by coercion, express or implied" [quotations and citations omitted]).
            As a general matter, "[t]he reasonableness of a search is assessed under the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations" (quotation and citation omitted).  Feliz I, 481 Mass. at 699.  In particular, we first consider "the incremental effect of the search on the [defendant's] privacy" in light of "the expectation of privacy of the person subject to the search" (citation omitted).  Commonwealth v. Roderick, 490 Mass. 669, 672 (2022).  Second, we assess the degree to which the search in question intrudes upon the defendant's expectation of privacy given both the "nature of the [search] and its manner of execution," and "the character and quantity of the information that would be revealed by the search" (citation omitted).  Id.  Third, we assess the "extent to which the search advances a legitimate government interest."  Id.
            Taking each step in turn, we begin with the privacy expectations of the defendant.  Both "this court and the [United States] Supreme Court have recognized that, although probationers do not give up all expectations of privacy while on probation, their expectations are significantly diminished."  Johnson, 481 Mass. at 722.  At the same time, "[t]he reasonable expectation of privacy of a defendant pretrial, such as the defendant here, is greater than that of a probationer."  Norman, 484 Mass. at 334.  In short, the defendant's expectation of privacy was less than that of an ordinary private citizen but greater than that of a probationer.  See United States v. Scott, 450 F.3d 863, 873-874 (9th Cir. 2006) (defendant on pretrial release had "reduced expectation of privacy" but nevertheless possessed "privacy and liberty interests [that] were far greater than a probationer's").
            With respect to intrusiveness, "[w]e have described two primary ways in which a GPS device burdens its wearer."  Garcia, 486 Mass. at 354.  First, due to its physical attachment and mandatory maintenance, a GPS monitoring device both "function[s] as a modern day scarlet letter, alerting others of the individual's involvement in the criminal justice system," and generates a variety of practical burdens resulting from the need to immediately contact law enforcement employees in the event of battery or connectivity issues, or risk arrest (quotations and citation omitted).  Id.  Second, "the character and quantity of the information" revealed by GPS monitoring, Roderick, 490 Mass. at 672, embodies a "detailed, encyclopedic, and effortlessly compiled" log of the wearer's movements, Carpenter v. United States, 585 U.S. 296, 309 (2018).  Given these burdens, there can be no question that GPS monitoring is a "severe[ly] intrusi[ve]" form of search.  Norman, 484 Mass. at 340.
            Third, we consider the legitimate governmental interests advanced by subjecting the defendant to GPS monitoring as a condition of pretrial release.  "When a search, such as GPS monitoring, is conducted as a pretrial condition of release, the only legitimate justifications for doing so are those authorized by statute . . . ."  Norman, 484 Mass. at 336.  Where GPS monitoring is imposed at arraignment as a condition of pretrial release, the only legitimate justifications are those authorized by the applicable bail statute:  G. L. c. 276, § 58.  Norman, supra.  The applicable bail statute identifies three conditions of release.
            First, bail amounts shall be set "in an amount no higher than what would reasonably assure the appearance of the person before the court."  G. L. c. 276, § 58, first par.  This indicates that ensuring a defendant's appearance in court is a legitimate justification, which may be advanced by imposing GPS monitoring as a condition of pretrial release.
            Second, if the judge setting bail "determines it to be necessary, the defendant may be ordered to abide by specified restrictions on personal associations or conduct including, but not limited to, avoiding all contact with an alleged victim of the crime and any potential witness or witnesses who may testify concerning the offense, as a condition of release."  G. L. c. 276, § 58, first par.  This indicates that enforcing a "stay away" or "no contact" order protecting alleged crime victims and potential witnesses is a legitimate justification, which also may be advanced by imposing GPS monitoring as a condition of pretrial release.
            Third, with respect to defendants charged with domestic violence offenses, the bail judge "may impose conditions on a person's release in order to ensure . . . the safety of the alleged victim, any other individual or the community."  G. L. c. 276, § 58, third par.  This indicates that enforcing a "stay away" or "no contact" order to protect alleged victims of domestic violence, in particular, is a legitimate justification that may be advanced by imposing GPS monitoring as a condition of pretrial release.
            Here, there is no contention that the defendant poses a significant risk of failing to appear before the court.  Hence, only the second and third statutorily prescribed justifications apply.  Drawing together these elements, the constitutionality of the initial imposition of GPS monitoring on the defendant turns on the following question:  did GPS monitoring advance the legitimate governmental interest in protecting C.P. and her daughter, as expressed in the two applicable statutory justifications, to such a degree that it outweighs the intrusion on the defendant's privacy occasioned by GPS monitoring, in light of both the intrusiveness of GPS monitoring and the defendant's intermediate expectation of privacy as a defendant on pretrial release?  For the reasons stated below, we hold that the answer is yes.
            As a threshold matter, we observe that both the defendant and the Commonwealth appear to overlook an important component of the governmental interests at stake.  Specifically, in assessing the legitimate governmental interests supporting the initial imposition of GPS monitoring, both parties focus on the fact that the Commonwealth did not have knowledge of C.P.'s home address at the time that monitoring was imposed as a condition of release.  In consequence, there was no "exclusion zone" with which the defendant's GPS device could be configured, such that any incursion by the defendant into that exclusion zone would trigger an automatic alert to authorities.  And "[a]bsent evidence that an effective exclusion zone would be configured in the defendant's GPS device, the Commonwealth could not establish how GPS monitoring would further its interest in enforcing the court-ordered exclusion zone."  Roderick, 490 Mass. at 679.  Drawing on this insight, the Commonwealth assumes arguendo that the initial imposition of GPS monitoring could be justified only on the basis of the defendant's consent.  Likewise, the defendant treats this insight as "dispositive."  In so doing, both parties overlook another one of the defendant's conditions of pretrial release:  namely, the requirement that he stay away from C.P. and her daughter wherever they might be found.
            The gravity of the legitimate governmental interests at stake bears emphasis.  Protecting C.P. and her daughter fell squarely within two of the three legitimate justifications identified by the Legislature for imposing pretrial conditions of release under G. L. c. 276, § 58.  During the December 26 altercation that gave rise to the relevant criminal charges, the defendant was heard saying to C.P. that he would "shoot her family's faces off" and that "[y]ou can testify against me and get killed or leave it."  In the context of the defendant's alleged conduct, C.P. and her daughter were both "alleged victim[s]" and "potential witness[es]" under the first applicable statutory justification for imposing pretrial conditions of release.  G. L. c. 276, § 58, first par.  Further, as alleged victims of assault and battery on a family or householder member within the meaning of G. L. c. 265, § 13M, C.P. and her daughter also fell squarely within the scope of "alleged victim[s], any other individual[s] or the community" per G. L. c. 276, § 58, third par.  In short, specific words and conduct by the defendant directly implicate legitimate State interests in protecting alleged crime victims, protecting potential witnesses, and protecting alleged victims of domestic violence.
            To be sure, the mere fact that weighty and legitimate State interests would in principle be advanced by the challenged search does not imply that the challenged search is reasonable and therefore constitutional.  To vindicate the search, the Commonwealth must "establish how GPS monitoring, when viewed as a search, furthers its interests."  Roderick, 490 Mass. at 673, quoting Feliz I, 481 Mass. at 705.  Likewise, there must be "particularized reasons for imposing GPS monitoring on this defendant."  Feliz I, supra at 701.  Unlike a "stay away" order tied to a specific location, a "stay away" order or "no contact" order tied to a specific individual cannot be enforced by means of a mobile "exclusion zone" simply because the movements of the protected individual are not themselves subject to constant tracing.  However, it does not follow –- nor is it the case –- that GPS monitoring does not meaningfully advance the Commonwealth's legitimate interest in enforcing "stay away" and "no contact" orders.
            In general, GPS monitoring puts wearers on notice that their movements are accessible for review by probation authorities.  See Johnson, 481 Mass. at 724 ("a probationer subject to GPS monitoring as a condition of probation would certainly objectively understand that his or her location would be recorded and monitored to determine compliance with the conditions of probation").  See also Commonwealth v. Rosendary, 313 A.3d 236, 245 (Pa. Super. Ct. 2024) (defendant was "on notice that the parole system received information about his locations twenty-four hours a day to ensure he did not engage in further prohibited activity").  In virtue of being on notice that location data about their physical movements is accessible for review by probation authorities, those subject to GPS monitoring are also on notice that any violation of the terms of their release could easily be verified by the relevant law enforcement authorities.  Johnson, supra (probationer subject to GPS monitoring "would certainly objectively understand . . . that police would have access to this location information for th[e] purpose [of determining compliance with probation conditions]").  United States v. Jackson, 214 A.3d 464, 467–468 (D.C. 2019) (defendant "had no objectively reasonable expectation that [probation authorities] would withhold the GPS tracking data from the police").  These general features of GPS monitoring apply to persons on pretrial release just as they do to those on probation.  Moreover, awareness that any violation of the terms of release could easily be verified by law enforcement authorities provides a powerful deterrent to violating those release terms.  And although general deterrence of criminal activity is not a permissible goal of pretrial conditions of release under G. L. c. 276, § 58, Norman, 484 Mass. at 338, deterrence of specific activity that would expressly violate the terms of pretrial release is implicit in the bail statute's authorization to "specif[y] restrictions on personal associations or conduct" and "impose conditions" in order to safeguard protected parties, G. L. c. 276, § 58.
            To give just one example, if a defendant subject to a "no contact" order commenced a practice of stalking the protected party, and if the protected party reported the defendant's violation of the order to law enforcement authorities, in practice the most effective means of confirming that report and taking appropriate remedial action could in many circumstances be through GPS monitoring.  And given the specific words and conduct of the defendant, specific deterrence of violations of the "stay away" and "no contact" orders is a "particularized reason[] for imposing GPS monitoring on this defendant."  Feliz I, 481 Mass. at 701.  More broadly, GPS monitoring meaningfully advances the weighty and legitimate State interest in protecting C.P. and her daughter as alleged crime victims, potential witnesses, and alleged victims of domestic violence.
            Taking into account the "totality of the circumstances" (citation omitted), Feliz I, 481 Mass. at 699, we conclude that the Commonwealth's legitimate governmental interest in enforcing the "stay away" and "no contact" orders outweighs the defendant's expectation of privacy.  We are cognizant of the fact that GPS monitoring is indeed a "severe intrusion" on any person's liberty.  Norman, 484 Mass. at 340.  We are also cognizant of the fact that art. 14 "requires an individualized determination of reasonableness in order to conduct more than minimally invasive searches" such as GPS monitoring.  Feliz I, supra at 690-691.  One aspect of this "individualized determination" is the defendant's intermediate status as a person on pretrial release.  Although a pretrial releasee's expectation of privacy exceeds that of a probationer, Norman, supra at 334 -- first and foremost because such a person continues to enjoy the presumption of innocence -- a pretrial releasee's expectation of privacy is still meaningfully "reduced" relative to that of an ordinary citizen, Scott, 450 F.3d at 873-874.  Simply put, the defendant does not enjoy the "absolute liberty" of an ordinary citizen not subject to criminal supervision (citation omitted).  Garcia, 486 Mass. at 351.  A second aspect of this "individualized determination" is the defendant's conduct.  We acknowledge and give due weight to the fact that, at the time GPS monitoring was imposed in July 2020, the defendant had not attempted to contact C.P. or her daughter since the December 26 incident.  At the same time, we must also acknowledge and give due weight to the particulars of that incident:  again, the defendant's specific threat of reprisal should C.P. serve as a witness; his specific threat to "shoot [the] family's faces off"; and his alleged discharge of a firearm in close proximity to C.P.'s daughter.  Given this "constellation of factors," Feliz I, supra at 701, the Commonwealth's legitimate State interest in imposing GPS monitoring as a condition of pretrial release outweighs the defendant's expectation of privacy.  From this, it follows that the initial imposition of GPS monitoring was a reasonable -- and therefore constitutional -- search under art. 14.
            b.  The retrieval and review of GPS location data.  "The Commonwealth's retrieval and review of this historical [GPS location] data requires a separate constitutional inquiry under the Fourth Amendment and art. 14 . . . ."  Johnson, 481 Mass. at 720.  The need for a separate constitutional inquiry stems from two factors.
            First, the initial imposition of GPS monitoring and the subsequent retrieval and review of the defendant's historical location data were undertaken for different purposes at the direction of different parties.  "The decision to review the GPS location data was not, for example, the result of the defendant [violating the 'stay away' or 'no contact' orders].  Nor was this a review of the defendant's location by a probation official to ensure compliance with any of the defendant's other conditions of [pretrial release]."  Johnson, 481 Mass. at 720.  Rather, the defendant's GPS location data was retrieved and reviewed on the basis of an investigating officer's hunch that someone subject to GPS monitoring may have been responsible for the August 1 shooting incident, a crime that bore no relationship to the crimes for which the defendant was on pretrial release.  See id. at 721.
            Second, the two acts burden distinct privacy concerns.  The initial imposition of GPS monitoring burdens a general interest in not having information about the "whole of [one's] physical movements" readily accessible to law enforcement authorities for retrieval and review (citation omitted).  Norman, 484 Mass. at 334.  This concern is distinct from a more specific privacy interest in not having particular "slices" of one's historical location data actively accessed and reviewed for investigatory purposes.  In addition, the initial imposition of GPS monitoring burdens distinct interests inherent to the physical attachment of a location monitoring device on the body of a criminal defendant.  See, e.g., Grady, 575 U.S. at 309 ("a State also conducts a search [under the Fourth Amendment] when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements"); Garcia, 486 Mass. at 354 (GPS ankle bracelet "function[s] as a modern day scarlet letter, alerting others of the individual's involvement in the criminal justice system" [quotations and citation omitted]).  By contrast, the retrieval and review of the defendant's location data after the initial imposition of GPS monitoring does not, as such, impose any additional stigma nor physical intrusion on the defendant's body, over and above the burdens already intrinsically implicated by GPS monitoring.
            In short, the retrieval and review of the defendant's historical location data was a distinct constitutional event from the initial imposition of GPS monitoring.  As such, it calls for a "separate constitutional inquiry."  Johnson, 481 Mass. at 720.
            Under this separate inquiry, we first determine whether the warrantless retrieval and review of the defendant's GPS location data was a search in the constitutional sense.  "[A] search in the constitutional sense occurs when the government's conduct intrudes on a person's reasonable expectation of privacy" (citation omitted).  Commonwealth v. Mora, 485 Mass. 360, 364 (2020).  See Commonwealth v. McCarthy, 484 Mass. 493, 497 (2020) ("Under both the Fourth Amendment and art. 14, a search implicates constitutional protections when the government intrudes on a person's reasonable expectation of privacy" [quotation and citation omitted]).  This in turn depends on whether the challenged action intruded upon a "subjective expectation of privacy . . . that society is prepared to recognize as reasonable."  Odgren, 483 Mass. at 58.  The defendant bears the burden of establishing that governmental conduct intruded on a reasonable expectation of privacy and therefore constituted a search.  Commonwealth v. Miller, 475 Mass. 212, 219 (2016).  "To determine whether an expectation of privacy is reasonable, we consider the totality of the circumstances in the particular situation."  Commonwealth v. Carrasquillo, 489 Mass. 107, 120 (2022).  Only if we conclude that the government intruded on a reasonable expectation of privacy do we reach the subsequent question whether that search was reasonable.
            As the Odgren formulation suggests, there is a subjective dimension and an objective dimension to the threshold inquiry whether the challenged action intruded on a reasonable expectation of privacy.  First, we determine whether the defendant "manifested a subjective expectation of privacy in the object of the search" (citation omitted).  Commonwealth v. Augustine, 467 Mass. 230, 242 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015).  If we conclude that the defendant did manifest such a subjective expectation of privacy, we then determine whether "society is willing to recognize that expectation as reasonable" (citation omitted).  Id.  This inquiry is "highly dependent on the particular facts and circumstances of the case."  Commonwealth v. One 1985 Ford Thunderbird Auto., 416 Mass. 603, 607 (1993).
            Importantly, "[a]n individual may lose his or her expectation of privacy in some information, yet retain an expectation of privacy in separate, materially distinct information."  Roderick, 490 Mass. at 674.  Accordingly, we must specify the type and scope of information the retrieval and review of which is alleged to be a search.  Here, the retrieval and review of the defendant's historical GPS location data revealed two distinct categories of information.
            As discussed, Plunkett first obtained a list of five persons subject to GPS monitoring who were in the immediate vicinity of the address where the August 1 shooting incident occurred within a twenty-minute period centered on the time of the shooting.  This list revealed the identities of the five persons, as well as the time when each person entered and exited the immediate vicinity of that address, the closest distance obtained between each person and the address itself, each person's minimum and maximum speed during the relevant twenty-minute period, and the number of times each person's GPS monitoring device transmitted its location during that period.  Accompanying this list was a map of the relevant neighborhood, with a square demarcating an area several blocks wide and long and centered on the address in question as well as a scattering of points showing each person's approximate location when transmitted by the person's GPS monitoring device.  The list and accompanying map did not provide more fine-grained information about the precise location of each person during the relevant twenty-minute period.  After observing that the time and approximate location of the defendant's movements appeared to correspond to those of the shooting suspect, Plunkett obtained a more detailed reconstruction of the defendant's GPS points for a one-hour period centered on the time of the shooting.  Specifically, Plunkett obtained a list revealing the defendant's precise location (defined in terms of latitude and longitude), speed of travel, and direction of travel for each minute during the relevant one-hour period.
            In short, Plunkett's two inquiries produced "separate" and "materially distinct information" concerning the defendant.  Roderick, 490 Mass. at 674.  As such, they implicated distinct expectations of privacy.  The first inquiry raises the question whether the defendant had a subjective and objective expectation of privacy in historical location information revealing whether he was within the immediate vicinity of the August 1 shooting incident during a twenty-minute period centered on the time of the shooting, and what his approximate whereabouts were during that period.  The second inquiry raises the question whether, having been identified as one of five people who were in the immediate vicinity of the August 1 shooting incident, the defendant had a subjective and objective expectation of privacy in historical location information revealing his minute-by-minute location, speed, and direction of travel during a one-hour period centered on the time of that shooting.
            We begin with the defendant's subjective expectations of privacy.  Simply put, the factual record does not clearly indicate what these might have been.[4]  Although not dispositive, we observe that the defendant failed to submit an affidavit in support of his motion to suppress, articulating a subjective expectation of privacy in either set of location information.  In any event, we shall assume without deciding that the defendant in fact possessed a subjective expectation of privacy in both sets of location information.  We therefore turn to the question whether "society is willing to recognize [such an] expectation as reasonable" (citation omitted).  Augustine, 467 Mass. at 242.
            Our analysis is informed by our decision in Johnson.  In that case, location data for a defendant subject to GPS monitoring while on probation was retrieved and reviewed without a warrant after the relevant probationary period had ended.  Johnson, 481 Mass. at 711-712.  When the defendant was charged with larceny as well as breaking and entering, he moved to suppress the location data.  Id. at 712-713, 715.  We affirmed the denial of the defendant's motion to suppress on the grounds that he lacked an objective expectation of privacy in that location data.  Id. at 722-728, 730.  Specifically, we concluded that "[s]imply comparing subsets of the defendant's GPS location data recorded while he was on probation to the general times and places of suspected criminal activity during the probationary period is not a search in the constitutional sense."  Id. at 726-727.  In reaching that conclusion, we emphasized that someone in the defendant's position "would certainly objectively understand that his or her location would be recorded and monitored to determine compliance with the conditions of probation, including whether he or she had engaged in additional criminal activity . . . and that police would have access to this location information for that purpose."  Id. at 724.
            The same rationale applies here.  Although the defendant's enumerated conditions of release do not refer to criminal activity in general, the applicable bail revocation statute, G. L. c. 276, § 58B, provides for revocation of release and an order of detention when "there is probable cause to believe that the person [on pretrial release] has committed a federal or state crime while on release."  Furthermore, the docket sheet indicates that the defendant was explicitly advised of the potential for bail revocation under G. L. c. 276, § 58B, at his arraignment.[5]  Therefore, the defendant "would certainly objectively understand" that his location could be accessed in part to determine "whether he . . . had engaged in additional criminal activity . . . and that police would have access to this location information for that purpose."  Johnson, 481 Mass. at 724.
            Of course, the mere fact that the defendant would objectively understand that his location information could be retrieved and reviewed to determine whether he had engaged in criminal activity while on supervised release does not mean that any inquiry motivated by that purpose is constitutionally sound.  As discussed, the fundamental interest at stake in location monitoring is a "reasonable expectation of privacy in the whole of [one's] physical movements" (citation omitted).  Norman, 484 Mass. at 334.  Furthermore, "[w]hether surveillance reveals the whole of a defendant's movements turns on the duration of the surveillance, as well as its degree of comprehensiveness."  Commonwealth v. Perry, 489 Mass. 436, 446 (2022).  We conclude that neither Plunkett's twenty-minute inquiry into whether the defendant was in the immediate vicinity of the August 1 shooting incident nor Plunkett's subsequent one-hour inquiry into the defendant's whereabouts revealed "the whole of [the] defendant's movements" in that sense.  Id.
            As a general matter, "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable," whereas "the use of longer term GPS monitoring on investigations of most offenses impinges on expectations of privacy."  United States v. Jones, 565 U.S. 400, 430 (2012) (Alito, J., concurring).  From a purely quantitative perspective, twenty minutes or one hour of location data falls on the "short-term" end of the continuum between "short term" and "longer term."  Id.  Compare Augustine, 467 Mass. at 254-255 ("the tracking of the defendant's movements in the urban Boston area for two weeks was more than sufficient to intrude upon the defendant's expectation of privacy safeguarded by art. 14"), and Commonwealth v. Rousseau, 465 Mass. 372, 382 (2013) ("Although we need not decide how broadly such an expectation [of privacy] might reach and to what extent it may be protected, the fact that police monitored [the defendant] over a thirty-one-day period [using GPS] is sufficient to establish that he has standing to challenge the validity of the warrant"), with Commonwealth v. Estabrook, 472 Mass. 852, 858 (2015) ("the Commonwealth may obtain historical [cell site location information] for a period of six hours or less relating to an identified person's cellular telephone from the cellular service provider without obtaining a search warrant, because such a request does not violate the person's constitutionally protected expectation of privacy"), and United States vs. Hunt, U.S. Dist. Ct., No. 20-cr-10119-DJC (D. Mass. Sept. 24, 2021) (retrieving and reviewing one and one-half hours of pretrial releasee's GPS location data for each of two days does not constitute search).
            Furthermore, neither of Plunkett's two inquiries implicated the principled rationale underlying concerns about duration.  The principled rationale underlying these concerns is that long-term surveillance reveals "a pattern of activity."  Perry, 489 Mass. at 446.  As such, it can yield "a treasure trove of very detailed and extensive information about the individual's 'comings and goings' for law enforcement" (quotation and citation omitted).  Johnson, 481 Mass. at 717.  By contrast, instances of short-term surveillance merely reveal "details from isolated incidents."  Perry, supra.  Moreover, this difference is "not one of degree but of kind, for no single journey reveals the habits and patterns that mark the distinction between a day in the life and a way of life" (citation omitted).  Id.  Indeed, "[i]t is one thing for a passerby to observe or even to follow someone during a single journey as he goes to the market or returns home from work.  It is another thing entirely for that stranger to pick up the scent again the next day and the day after, week in and week out" (citation omitted).  McCarthy, 484 Mass. at 504.
            Plunkett's first inquiry revealed an "isolated incident[]" rather than a "pattern of activity."  Perry, 489 Mass. at 446.  Plunkett's first inquiry revealed that the defendant was one of five people subject to GPS monitoring who entered and exited the immediate vicinity of the crime scene during the relevant twenty-minute period.  This inquiry did not reveal the precise contours of the defendant's journey during each of those twenty minutes.  In that respect, the information yielded by Plunkett's first inquiry is analogous to the information yielded by the four automatic license plate readers in McCarthy, 484 Mass. at 508-509, which did not intrude upon a reasonable expectation of privacy.  In fact, Plunkett's first inquiry was less intrusive than the inquiry at issue in McCarthy because it did not reveal whether the defendant's entry to and exit from the relevant region was an aberration or a pattern.  See id. ("The cameras in question here gave police only the ability to determine whether the defendant was passing onto or off of the Cape at a particular moment, and when he had done so previously.  This limited surveillance does not allow the Commonwealth to monitor the whole of the defendant's public movements, or even his progress on a single journey").
            By contrast, Plunkett's second inquiry did reveal the precise contours of the defendant's movements during the relevant one-hour period.  However, this inquiry is more analogous to "follow[ing] someone during a single journey as he goes to the market or returns home from work" than to "pick[ing] up the scent again the next day and the day after that, week in and week out" (citation omitted).  McCarthy, 484 Mass. at 504.  See Perry, 489 Mass. at 453 ("Whereas [six continuous hours of location information] reveals at most one-quarter of one day's activities, [three hours of location information over seven days] reveals a pattern of activity, which implicates comparatively greater privacy interests").  Indeed, Plunkett's second inquiry embodied no more (and no less) than "comparing [a] subset[] of the defendant's GPS location data recorded while he was on [pretrial release]" with the "time[] and place[] of suspected criminal activity during the [pretrial release] period."  Johnson, 481 Mass. at 726-727.
            In sum, we conclude that the defendant has failed to establish that either of Plunkett's inquiries intruded upon an objectively reasonable expectation of privacy.  First, the defendant was aware that his physical movements were subject to GPS monitoring to ensure compliance with the conditions of his pretrial release, and he was also on notice that pretrial release could be revoked if he engaged in criminal activity while on supervised release.  Second, neither the twenty-minute inquiry into whether the defendant was near the scene of the crime nor the one-hour inquiry into the defendant's precise movements revealed a quantity or quality of information that intruded upon an objective expectation of privacy in the whole of one's physical movements.  We conclude that regardless of whether the defendant had a subjective expectation of privacy in the relevant location data, "society [would not be] willing to recognize that expectation as reasonable" (citation omitted).  Augustine, 467 Mass. at 242.  It follows that the retrieval and review of the defendant's location data vis-à-vis the August 1 shooting incident was not a search under art. 14.[6]
            3.  Conclusion.  The initial imposition of GPS monitoring on the defendant as a condition of pretrial release was a search under art. 14, because the imposition of GPS monitoring in general intrudes upon a person's reasonable expectation of privacy in information about the whole of one's physical movements.  However, because the degree of intrusion on the defendant's reasonable expectation of privacy was outweighed by legitimate State interests in protecting alleged crime victims, potential witnesses, and alleged victims of domestic abuse, this search was reasonable and therefore constitutional under art. 14.  By contrast, the subsequent retrieval and review of the defendant's GPS location data vis-à-vis the August 1 shooting incident was not a search under art. 14, because the defendant failed to establish that the act of retrieving and reviewing the relevant location data intruded on a reasonable expectation of privacy.
            These conclusions reflect our assessment of the "totality of the circumstances."  Carrasquillo, 489 Mass. at 120.  Feliz I, 481 Mass. at 701.  Although no one fact or circumstance is dispositive, when we assess the legitimate governmental interests advanced by the initial imposition of GPS monitoring, we cannot treat lightly the fact that in the midst of a domestic abuse incident the defendant specifically threatened to kill C.P. if she ever testified against him.  Likewise, our analysis of the subsequent retrieval and review of the defendant's historical GPS location data is limited to the parameters of a single twenty-minute inquiry into whether the defendant was in the immediate vicinity of the crime scene and a single one-hour inquiry into the defendant's precise whereabouts following an affirmative answer to that first inquiry.  We do not here decide whether multiple inquiries, inquiries of longer duration, or inquiries distributed over multiple days might intrude upon a pretrial releasee's reasonable expectation of privacy in otherwise similar circumstances.  See Perry, 489 Mass. at 453 (distinguishing art. 14 relevance of numerosity, duration, and distribution over days of location data inquiries).  As such, our holding is "dependent on the particular facts and circumstances of the case."  One 1985 Ford Thunderbird Auto., 416 Mass. at 607.
            In these circumstances, under art. 14, the initial imposition of GPS monitoring did not constitute an unreasonable search, and the subsequent retrieval and review of the defendant's GPS location data did not constitute a search.  We therefore affirm the motion judge's order denying the defendant's motion to suppress.
            So ordered.
 
footnotes

 
            [1] The parties focus their arguments on art. 14 jurisprudence, and our holding is accordingly addressed to art. 14.  However, we take care to note that "[t]he Fourth Amendment [to the United States Constitution] provides a floor below which the protection granted by art. 14 cannot fall."  Commonwealth v. Delgado-Rivera, 487 Mass. 551, 555 (2021), cert. denied, 142 S. Ct. 908 (2022).  Therefore, compatibility with art. 14 implies compatibility with the Fourth Amendment.  At the same time, a floor is not a ceiling:  art. 14 "does, or may, afford more substantive protection to individuals than that which prevails under the Constitution of the United States."  Commonwealth v. Mora, 485 Mass. 360, 365 (2020), quoting Commonwealth v. Almonor, 482 Mass. 35, 42 n.9 (2019).
            [2] We acknowledge the amicus brief submitted by the American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Inc., Committee for Public Counsel Services, Electronic Frontier Foundation, and Massachusetts Association of Criminal Defense Lawyers.
            [3] The defendant was also indicted for possession of ammunition without a firearm identification card, in violation of G. L. c. 269, § 10 (h).  However, that charge was subsequently dismissed at the request of the Commonwealth.
            [4] In particular, our inquiry would be illuminated by the presence of a signed, written agreement specifying the terms of the defendant's release on GPS monitoring.  Compare United States vs. Hunt, U.S. Dist. Ct., No. 20-cr-10119-DJC (D. Mass. Sept. 24, 2021) (rejecting subjective expectation of privacy by pretrial releasee based in part on content of written pretrial release agreement).  However, the factual record before us does not contain any such written agreement.
            [5] See G. L. c. 276, § 58, seventh par. ("The court shall provide as an explicit condition of release for any person admitted to bail pursuant to this section or [§ 57] that should said person be charged with a crime during the period of his release, his bail may be revoked in accordance with this paragraph and the court shall enter in writing on the court docket that the person was so informed and the docket shall constitute prima facie evidence that the person was so informed").
            [6] We note that in other jurisdictions, whether defendants subject to GPS monitoring as a condition of pretrial release have a reasonable expectation of privacy in subsequently accessed location data is an evolving question of law.  In general, other jurisdictions have found no reasonable expectation of privacy in these circumstances, although the reasons differ in their details.  See, e.g., Hunt, U.S. Dist. Ct., No. 20-cr-10119-DJC (retrieving and reviewing one and one-half hours of GPS location data for each of two days does not constitute search because of its limited duration and because of implied consent by defendant on pretrial release); United States vs. Clay, U.S. Dist. Ct., No. 4:12-CR-735-03 (S.D. Tex. May 6, 2013) (holding that "the defendant, by consenting to GPS monitoring, forfeited his reasonable expectation of privacy in the information sought"); People v. Campbell, 2018 COA 5, ¶ 31 (invoking third-party doctrine to conclude that "even if we assume [the defendant] subjectively believed his GPS data would remain private, that expectation was not one society would be prepared to call reasonable"); People v. Henderson, 76 Misc. 3d 1100, 1105-1106 (N.Y. Sup. Ct. 2022) (citing provision in GPS monitoring agreement indicating that defendant's location would be monitored and that location information could be shared with other law enforcement agencies to defeat subjective expectation of privacy in retrieved location data).